**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

CARMELITE SISTERS FOR THE AGED AND INFIRM, INC.; ST. PATRICK'S RESIDENCE; LITTLE SISTERS OF THE POOR CHICAGO PROVINCE, INC.; LITTLE SISTERS OF THE POOR CHICAGO, INC., D/B/A ST. MARY'S HOME; LITTLE SISTERS OF THE POOR OF PALATINE, INC., D/B/A ST. JOSEPH'S HOME; HIS EMINENCE BLASE CARDINAL CUPICH, ARCHBISHOP OF CHICAGO; LUKE VANDER BLEEK; MORR-FITZ, INC. D/B/A FITZGERALD PHARMACY,

*Plaintiffs*,

v.

TERRY PRINCE, in his official capacity as the Director of the Illinois Department of Veterans Affairs; SAMEER VOHRA, in his official capacity as Director of the Illinois Department of Public Health; MARIO TRETO, JR., in his official capacity as Secretary of the Illinois Department of Financial and Professional Regulation,

*Defendants*.

Case Number: 1:26-cv-10665

**VERIFIED COMPLAINT**

## NATURE OF THE ACTION

1. For almost 175 years, Illinois Catholics have put their faith into practice by caring for the sick with dignity and respect, and often without regard to their ability to pay. Since at least 1852, when Catholic religious sisters founded the first Catholic hospital in Chicago, Catholic religious communities have been offering care to the people of Illinois.

2. That tradition continues to this day. Inspired by their belief that life is a sacred and precious gift from God, the Carmelite Sisters for the Aged and Infirm and the Little Sisters of the Poor still faithfully serve the people of Illinois. They have lived out the teaching to see their patients as Jesus Himself, to cure if possible, and always to care.

3. This Catholic commitment to providing loving care even when no cure is possible plays out daily in the homes that the Sisters have established for elderly, often impoverished, Illinois residents. The Sisters' Catholic faith leads them to accept death as the natural end to a life well-lived: neither artificially prolonging it through burdensome technological and medical interventions that provide no reasonable benefit, nor artificially hastening it. Above all, it means that the Sisters seek personally to provide a loving human presence alongside each person—bearing witness to the ending of a uniquely beautiful and unrepeatable life.

4. The Sisters welcome residents of all faiths and none. But their homes have always been particularly important to Illinois Catholics who seek to live out their days in a place that welcomes and supports their beliefs.

5. The care that the Sisters provide is perhaps more important now than ever, with the rate of suicide continuing to rise across the nation, particularly among some of the most vulnerable populations, including the poor, the elderly, and veterans. Increasingly, the Sisters feel compelled to combat the lie that some lives are not worth living and that giving up is the only option.

6. This commitment to love as Jesus loved is echoed by Cardinal Cupich, Archbishop of Chicago, who has spiritual authority over all Catholic healthcare in the Archdiocese. Cardinal Cupich has decried Illinois' decision to "normalize suicide as a solution to life's challenges," and as fundamentally incompatible with the Catholic obligation to "honor the dignity of human life and provide compassionate care to those experiencing life-ending illness."[1]

7. Illinois should celebrate these efforts to help its neediest citizens. Indeed, it ought to pass legislation to support this work. At the very least, Illinois ought to heed federal law, which bans the use of federal healthcare funds for assisted suicide, and forbids Illinois from discriminating against those who, like the Sisters, refuse to participate in assisted suicide.

8. Instead, Illinois has put the Sisters and other Catholics providing health care in the Archdiocese to a stark choice: either abandon their religious beliefs regarding the sanctity of life or face significant fines and penalties.

---

1 Archdiocese of Chicago, *Statement of Cardinal Blase J. Cupich, archbishop of Chicago, on SB 1950 Assisted Suicide Bill* (May 30, 2025), https://perma.cc/G4WA-SZUW.

9. Through its euphemistically-named End-of-Life Options for Terminally Ill Patients Act, and the Act's incorporation of burdens imposed by the Health Care Right of Conscience Act, Illinois has conscripted even religious healthcare providers and institutions to participate in the provision of physician-assisted suicide.

10. Beginning September 12, medical providers caring for terminally ill Illinois residents will have to proactively inform and counsel their patients about their "option" to kill themselves.

11. This "Suicide Counseling Mandate" is far broader than anything required by states like California, Oregon, and Washington. And jurisdictions such as New Zealand and Victoria, Australia, which have also legalized assisted suicide, expressly forbid doctors from raising assisted suicide with their patients. Yet Illinois will soon require it.

12. These national and international norms against doctors raising assisted suicide with their dying patients exist for good reason. Public health researchers have extensively documented that an increase in the public discussion of suicide is often followed by an increase in suicide rates.

13. Illinois physicians and mental health professionals will also have to participate throughout the multi-step process of qualifying their patients to receive lethal suicide drugs. Pharmacists will also have to participate by filling prescriptions they know will be used for suicide.

14. And as though this were not enough, Illinois hospitals, nursing homes, and hospice residences will then have to allow patients to commit suicide in their

facilities, even if this jeopardizes their federal healthcare funding, like Medicare or Medicaid.

15. The many Illinois nurse practitioners, doctors, mental health professionals, pharmacists, hospitals, and care homes with religious or moral objections to participating in assisted suicide will have nowhere to go, because Illinois' purported "opt-out" still requires religious care providers like the Carmelite Sisters and the Little Sisters to directly participate in and materially assist the *same* medicalized suicides to which they object. The Catholic patients who do not want to be offered the chance to kill themselves at their lowest moment will be left out in the cold.

16. None of this is permitted by the Constitution. Indeed, the First Amendment's protections apply five times over.

17. First, the First Amendment's protected sphere of church autonomy requires the government to respect and stay out of matters of governance within religious institutions, such as how the Catholic Church chooses to implement its beliefs on the sanctity of human life and the decision of religious communities to form themselves around those same principles. Where the current Pope, along with Cardinal Cupich, has commanded that Illinois Catholics must "respect the sacredness of life from the very beginning to the very end" by not participating in assisted suicide,[2] the state has no business forcing them to do just that.

---

[2] Paolo Santalucia, *Pope disappointed over approval of assisted suicide legislation in his home state of Illinois*, Chicago Tribune (Dec. 23, 2025), https://perma.cc/NM9C-Z4AD.

18. Second, its protection of the free exercise of religion prohibits the government from burdening the sincere religious beliefs of Plaintiffs and the patients they serve unless the state is furthering an interest of the highest order and using the least-restrictive means to do so—an exceedingly high bar Defendants cannot meet.

19. Third, its protections against religious gerrymanders prohibit the government from enacting legal burdens that fall uniquely on religious adherents—such as those who object to providing assisted suicide.

20. Fourth, its protections against compelled speech prevent the government from forcing Catholic doctors and nurses to speak the government's preferred, supportive message of assisted suicide.

21. And fifth, its protections for freedom of association allow the Catholic Church, its various communities, and the patients they serve, to organize themselves into like-minded communities with the same values and beliefs—the mission of which is to live faithfully according to those beliefs, for however long or short a time.

22. Illinois claimed that the End-of-Life Options Act was passed to "provide[] an additional end-of-life care option for terminally ill individuals who seek to retain their autonomy and some level of control over the progression of the disease as they near the end of life or to ease unnecessary pain and suffering." 410 ILCS § 22/5(a)(2). Illinois also claimed that it would still respect the "fundamental right [of patients] to determine their own medical treatment options in accordance with their own values, beliefs, or personal preferences." *Id.* § 22/5(a)(4). But, in passing the Act, Illinois has stripped that very choice away from the Sisters and their patients—denying the

choice of a dignified death to the many residents of Illinois who, following their sincere religious beliefs, wish to die naturally in the Sisters' faith-filled homes, secure in the knowledge that they will not be urged to consider cutting short their life through suicide.

23. The Court can address these problems by enforcing federal law and the First Amendment and finding that Illinois cannot coerce religious providers in this way. That approach would leave the End-of-Life Options Act generally in force. Alternatively, the Court could also invalidate the entire End-of-Life Options Act, because it violates the Americans with Disabilities Act, the Equal Protection Clause, and the Supremacy Clause.

24. Either way, Illinois' effort to control religious providers and their patients is unlawful and cannot stand.

## JURISDICTION AND VENUE

25. This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

26. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

27. Venue lies in this district under 28 U.S.C. § 1391(b)(1) because Defendants reside in the Northern District of Illinois. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Northern District of Illinois.

## IDENTIFICATION OF PARTIES

28. Plaintiff the Carmelite Sisters for the Aged and Infirm (the Carmelite Sisters) is a congregation of Carmelite Sisters with its motherhouse in Germantown, New York. The congregation is incorporated as a non-profit corporation under New York law.

29. Plaintiff St. Patrick's Residence (St. Patrick's) is a licensed skilled nursing facility sponsored by the Carmelite Sisters located in Naperville, Illinois, that provides care to elderly individuals, including palliative care aimed at providing comfort for those in their final days. St. Patrick's Residence is a corporation organized under the General Not-For Profit Corporation Act of 1986 of the State of Illinois.

30. Plaintiff Little Sisters of the Poor Chicago Province, Inc., is a Province of the Little Sisters of the Poor (Little Sisters) that oversees homes run by the Little Sisters in Illinois. Its principal place of business is in Palatine, Illinois.

31. Plaintiff Little Sisters of the Poor Chicago, Inc., d/b/a St. Mary's Home, is a licensed nursing home in Chicago, Illinois, operated by the Little Sisters of the Poor that offers skilled nursing care to impoverished residents aged 65 or older. Little Sisters of the Poor Chicago, Inc., separately runs Jugan Terrace, an independent living community, also in Chicago.

32. Plaintiff Little Sisters of the Poor of Palatine, Inc., d/b/a St. Joseph's Home, is a licensed nursing home in Palatine, Illinois, operated by the Little Sisters of the Poor that offers skilled nursing care to impoverished residents aged 65 or older. Little

Sisters of the Poor of Palatine, Inc., separately runs the Jeanne Jugan Residence, an independent living community, also in Palatine.

33. Plaintiff Blase Cardinal Cupich (Cardinal Cupich) is the head of the Archdiocese of Chicago (the Archdiocese), an Archdiocese of the Roman Catholic Church. Cardinal Cupich is responsible for administering its religious and civil functions. Such duties include ensuring that all Catholic healthcare facilities within the Archdiocese operate in accordance with the Church's beliefs and interpreting the Church teachings set forth in documents such as the Code of Canon Law and the Catechism of the Catholic Church.

34. Plaintiff Luke Vander Bleek is a Catholic pharmacist who resides in Morrison, Illinois.

35. Plaintiff Morr-Fitz, Inc., is an Illinois corporation whose president and sole shareholder is Luke Vander Bleek. Morr-Fitz owns and operates Fitzgerald Pharmacy, a pharmacy located in Morrison, Illinois.

36. Defendant Terry Prince is the Director of the Illinois Department of Veterans Affairs. He is charged with promulgating rules to effectuate EOLOA. 410 ILCS § 22/105. He is sued in his official capacity only.

37. Defendant Sameer Vohra is the Director of the Illinois Department of Public Health. He is charged with promulgating rules to effectuate EOLOA. 410 ILCS § 22/105. He is also responsible for overseeing the licensing of nursing homes. 210 ILCS § 45/3-301; Ill. Admin. Code tit. 77, §§ 300.140, 300.180. And, through a cooperative agreement with the U.S. Department of Health and Human Services'

Centers for Medicare and Medicaid Services, he is also responsible for ensuring that facilities accepting Medicare and Medicaid payment for services rendered to program beneficiaries meet federal regulations and certification rules. He is sued in his official capacity only.

38. Defendant Mario Treto, Jr., is the Secretary of the Illinois Department of Financial and Professional Regulation. He is responsible for administering and regulating physician, nursing, and pharmacist licenses in Illinois and exercises disciplinary authority over physicians and nurses. 225 ILCS § 65/70-80(c). He is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### *The Illinois End of Life Options Act and the Illinois Health Care Right of Conscience Act*

39. For close to 30 years, federal law has prohibited the use of federal healthcare funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." Assisted Suicide Funding Restriction Act of 1997 § 3(a)(1), 42 U.S.C. § 14402(a)(1).

40. More recently, the Affordable Care Act has made clear that "any State … that receives Federal financial assistance," including Medicaid or Medicare funds, "may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any

individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a). On information and belief, Illinois is one such state.

41. As a general matter, Illinois law prohibits offering to help someone commit suicide. Indeed, it is a felony to "intentionally … offer[] and provide[] the physical means by which another person commits or attempts to commit suicide, or … participate[] in a physical act by which another person commits or attempts to commit suicide." 720 ILCS § 5/12-34.5(a)(2). Nor may one "coerce[] another to commit suicide" by "exercis[ing] substantial control over the other person through (i) control of the other person's physical location or circumstances; (ii) use of psychological pressure; or (iii) use of actual or ostensible religious, political, social, philosophical or other principles." *Id.* § 5/12-34.5(a)(1).

42. Despite these clear federal bans, and in direct contradiction to Illinois' own general prohibition against assisting suicide, Governor Pritzker signed the Illinois End-of-Life Options for Terminally Ill Patients Act (EOLOA) into law on December 12, 2025, with an effective date of September 12, 2026. *See* 410 ILCS § 22/1 *et seq.*

43. EOLOA declares that "mentally capable adult individuals have a fundamental right to determine their own medical treatment options in accordance with their own values, beliefs, or personal preferences," and that access to suicide "is an expression of this fundamental right." 410 ILCS § 22/5(a)(4).

44. It also declares that assisted suicide "is part of general medical care." *Id.* § 22/5(a)(1).

45. EOLOA delegates rulemaking authority "for the implementation and administration of this Act" to the Department of Veteran's Affairs and the Department of Public Health. *Id.* § 22/105.

46. EOLOA defines covered healthcare entities to include "hospital[s] or hospital affiliate[s], nursing home[s], hospice[s]," and facilities licensed under "the Ambulatory Surgical Treatment Center Act; the Home Health, Home Services, and Home Nursing Agency Licensing Act; the Hospice Program Licensing Act; the Hospital Licensing Act; the Nursing Home Care Act; or the University of Illinois Hospital Act." *Id.* § 22/10.

47. By contrast, neither assisted living facilities, 210 ILCS § 9/10 *et seq.*, nor hospice programs that provide home care, inpatient care, or both, 210 ILCS § 60/3 (h-5), are included in this broad list. Thus, although both assisted living facilities and hospice programs regularly care for dying patients, they have no obligations imposed on them by EOLOA.

48. If a patient wants to commit physician-assisted suicide at any of the facilities listed in the Act, there is a carefully constructed and detailed process for the patient to do so. First, the process is only open to a subset of patients—those whom the statutes define as having a "terminal disease." Whether the patient's diagnosis is terminal is patient-specific—it depends on whether that particular patient, based on the physician's "reasonable medical judgment," has a disease that will "result in death within 6 months." 410 ILCS § 22/10.

49. For patients who qualify, the assisted suicide process can be broken down into four steps: (1) informing patients and counseling them about their ability to obtain lethal drugs, (2) qualifying the patient through required documentation of two oral requests and a written request, (3) prescribing the lethal drugs, (4) having the prescription filled at a licensed pharmacy, and (5) the patient taking the lethal drugs to commit suicide.

Informing and Counseling

50. Studies of U.S. states that have legalized assisted suicide show an increase in suicide rates overall, particularly among older adults.[3] This result is not surprising, since researchers have found that "suicide contagion" can occur "when the exposure to suicide" of another person "influences others to attempt suicide." U.S. Ctrs. for Disease Control & Prevention: Suicide Prevention, *Guidelines for Reporting a Suicide Cluster* (May 27, 2026), https://perma.cc/ZE3Z-9EA9. This exposure can happen both directly (through exposure to the suicide of someone personally known) and indirectly (through media reporting about someone who has committed suicide), and the effect is much greater when the person reported about is a respected celebrity. *Id.*; World Health Org., *Preventing suicide: a resource for media professionals* 8 (2023), https://perma.cc/FT8Y-3Z6U (noting consistent results over 100 studies; observing that the effect of a media report is greater when the person involved is a celebrity).

---

[3] David Albert Jones & David Paton, *How Does Legalization of Physician-Assisted Suicide Affect Rates of Suicide?*, 108 S. Med. J. 599, 602 (2015) (finding "strong evidence that the legalization of [assisted suicide] is associated with increases in the rate of suicide, if assisted suicides are included").

51. To their patients, doctors are often respected voices of authority. For a seriously ill patient, hearing from a trusted doctor that they have the "option" of assisted suicide may exert an influence not unlike suicide contagion. This helps explain why New Zealand and Victoria, Australia, ban doctors from raising assisted suicide with their patients. End of Life Choice Act 2019, pt 2, s 10 (N.Z.) ("Assisted dying must not be initiated by the health practitioner"); *Voluntary Assisted Dying Act 2017* (Vic) pt 1 div 8 ("Voluntary assisted dying must not be initiated by registered health practitioner").

52. Indeed, it is for reasons like these that the American Medical Association continues to oppose assisted suicide as "fundamentally incompatible with the physician's role as healer," "difficult or impossible to control," and posing "serious societal risks." Am. Med. Ass'n, *Opinion 5.7: Physician-Assisted Suicide*, in *Code of Medical Ethics* (2d ed. 2022), https://perma.cc/2KMT-NV3Y.

53. Raising suicide explicitly is particularly dangerous among populations already at increased risk of committing suicide.

54. Veterans, for instance, commit suicide at approximately twice the rate of the average population, and are uniquely susceptible to suicide contagion.[4] Despite extensive efforts to address this problem, approximately 17 veterans commit suicide

---

[4] *See* Off. of Suicide Prevention, U.S. Dep't of Veterans Affs., *2025 National Veteran Suicide Prevention Annual Report, Part 2: Report Findings*, 13 (Mar. 2026), https://perma.cc/NQ4X-39D9 (Between 2018 and 2023, the Veteran suicide rate ranged from 32.5-35.2 per 100,000 and non-Veteran adult suicides were ranged from 16.0-17.2 per 100,000); Jacey Eckhart, *Are Military Suicides Contagious?*, Military.com (July 20, 2022), https://perma.cc/6HY4-V3J5 (Contagion occurs particularly among tight-knit communities, like the military).

every single day.[5] One study found that among military personnel and veterans of post-9/11 wars, over 30,000 veterans committed suicide while only about 7,000 died in combat, making a veteran 4 times more likely to die by suicide than in combat.[6]

55. For this reason, Illinois passed the Suicide Prevention, Education, and Treatment Act, Public Act 93-907, and created the Illinois Suicide Prevention Alliance, which works to prevent suicides within the State.[7] For veterans in particular, the Illinois Department of Veterans Affairs and Illinois Department of Public Health work to advance the U.S. Department of Veterans Affairs' national strategy for preventing veteran suicide,[8] including through suicide prevention trainings and other mental health services geared toward helping veterans stay alive and thrive.[9]

56. By passing EOLOA and giving the state Department of Veteran's Affairs authority to regulate under the new law, Illinois has taken a drastically different tack, and attempted to force unwilling providers to participate. Illinois now requires health care providers to counsel their terminally ill patients about assisted suicide—

---

[5] Off. of Suicide Prevention, U.S. Dep't of Veterans Affs., *2025 National Veteran Suicide Prevention Annual Report*, 4 (Mar. 2026), https://perma.cc/NQ4X-39D9.

[6] Thomas Howard Suitt, III, *High Suicide Rates Among United States Service Members and Veterans of the Post-9/11 Wars*, Brown Univ., 3 (June 21, 2021), https://perma.cc/TP8L-AHBR.

[7] Ill. Dep't of Pub. Health, *Suicide Prevention*, https://perma.cc/Y7F8-LADN.

[8] U.S. Dep't of Veterans Affs., *National Strategy for Preventing Veteran Suicide: 2018-2028* (2018), https://perma.cc/T2JZ-7F62.

[9] *See, e.g.*, Ill. Dep't of Veterans Affs., *Governor's Challenge*, https://perma.cc/4WFE-QL5Y; Ill. Dep't of Pub. Health, *Veteran Suicide Prevention*, https://perma.cc/L295-EZQ4.

even when those patients are already at a high risk of suicide because of their veteran status.

57. EOLOA and the HCRCA impose extensive informing and counseling obligations on Illinois health care providers. EOLOA is triggered by the diagnosis of a "terminal disease," which EOLOA defines as "an incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months." 410 ILCS § 22/10.

58. When a patient is diagnosed with a terminal disease, EOLOA requires his "attending physician," the "physician who has primary responsibility for the care of the patient and treatment of the patient's terminal disease," *id.*, to offer to provide the patient with information regarding "the foreseeable risks and benefits" of all end-of-life-care options, *id.* § 22/15(b). This includes the "potential risks and benefits" of taking suicide drugs. *Id.* § 22/10.

59. EOLOA doubles down on this requirement, stating that "[n]othing in this Act may be construed to limit the amount of information provided to a patient to ensure the patient can make a fully informed health care decision." *Id.* § 22/15(a).

60. EOLOA also "incorporate[s] by reference" the Healthcare Right of Conscience Act (HCRCA), *id.* §§ 22/60(g), 22/65(g), which also includes a duty to inform and counsel patients about the benefits of suicide, *see* 745 ILCS § 70/1 *et seq*.

61. The HCRCA purports to provide conscience protections to healthcare institutions, stating that no institution "shall be civilly or criminally liable … by reason of refusal of the health care facility to *permit* or *provide* any particular form

of health care service which violates the facility's conscience as documented in its ethical guidelines, mission statement, constitution, bylaws, articles of incorporation, regulations, or other governing documents." *Id.* § 70/9 (emphasis added).

62. However, the HCRCA also provides that covered facilities "shall adopt written … protocols … to ensure that conscience-based objections do not cause impairment of patients' health." *Id.* § 70/6.1. These protocols "*shall* inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner." *Id.* § 70/6.1(1) (emphasis added); *see also id.* § 70/6 ("Nothing in this Act shall relieve a physician from any duty … to inform his or her patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of treatment options").

63. The protocols must also address what must occur if a patient requests a "treatment option" that "is contrary to the conscience of the health care facility, physician, or health care personnel." *Id.* § 70/6.1(2). In those instances, the objecting facility or healthcare personnel has two options: Either it "shall" ensure that the patient will be "provided the requested health care service by others in the facility," or it "shall … refer the patient to," "transfer the patient to," or "provide in writing information to the patient about" "other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in." *Id.* § 70/6.1(2)-(3).

64. Now that assisted suicide is a "legal treatment option[]" for Illinois residents, the HCRCA, in addition to EOLOA, also requires covered institutions and their

healthcare providers to counsel patients about the "benefits" of committing suicide. *Id.* § 70/6.[10]

65. The HCRCA defines covered healthcare facilities exceedingly broadly to cover all "institution[s] or location[s] wherein health care services are provided to any person," including "dispensar[ies]." *Id.* § 70/3(d). This definition covers St. Patrick's Residence, St. Mary's Home, St. Joseph's Home, and Fitzgerald Pharmacy, but not Jugan Terrace or Jeanne Jugan Independent Living Apartments.

<u>Qualifying</u>

66. Once a patient has been diagnosed with a terminal disease and informed of his legal treatment options, he can begin the process of obtaining lethal drugs to commit suicide under EOLOA. To do so, a terminally ill patient must first make an initial oral request to his attending physician. 410 ILCS § 22/25(a). This oral request "shall be documented by the attending physician." *Id.* § 22/25(a)(2).

67. After the first oral request, the patient must then request suicide in writing, using a form specified in EOLOA. *Id.* §§ 22/25(a)(3), 22/30. The patient's written request must be signed by the patient and witnessed by at least two adults. *Id.* § 22/30. The written request attests that the patient has been informed of "the risks and benefits" of taking the suicide drugs, as well as "that the likely outcome … is death." *Id.* § 22/30(e)

[10] The State of Illinois is currently challenging an order permanently enjoining 745 ILCS § 6.1(1)'s requirement that providers discuss the "benefits" of assisted suicide. *See* Cross-Appellant's Br., *NIFLA v. Treto*, Nos. 25-1603, 25-1659, 25-1655, 25-1657 (7th Cir. Oct. 27, 2025) (argued Apr. 10, 2026).

68. The patient must also make a second oral request for suicide, no sooner than five days after the first. *Id.* § 22/25(a)(4). This requirement is removed "if the individual's attending physician has medically determined that the individual will, within reasonable medical judgment, die within 5 days after making the initial oral request." *Id.* § 22/25(c).

69. Separate from the attending physician's responsibility to oversee and document any request for suicide, the provider also "shall conduct an evaluation" that, among other things, (1) confirms that the patient has a terminal disease, has decision-making capacity, and is requesting assisted suicide voluntarily; (2) informs the patient of the diagnosis, prognosis, and "potential risks, benefits, and probable result of self-administering" the suicide drugs as well as other "feasible" end-of-life alternatives; and (3) "refer[s] the patient to a consulting physician for medical confirmation that the patient" is eligible for suicide. *Id.* § 22/35(a). The consulting physician must perform a similar "evaluation" and "confirm [his findings] in writing to the attending physician." *Id.* § 22/40.

70. Once the consulting physician has confirmed eligibility, the attending physician must "include the consulting physician's written determination in the patient's medical record." *Id.* § 22/35(a)(8).

71. The attending physician must also "refer the patient to a licensed mental health professional" if either the attending or consulting physician has doubts about the patient's ability to make an informed decision and "include the licensed mental

health professional's written determination in the patient's medical record." *Id.* § 22/35(a)(9)-(10); *see also id.* § 22/45.

72. Finally, the attending physician must engage in extensive discussions regarding the act of committing suicide itself, including "inform[ing] the patient of the benefits of notifying the next of kin of the patient's decision to" commit suicide; "offering the patient an opportunity to rescind the request for" suicide; and apprising the patient of "the recommended procedure for self-administering" the suicide drugs and "the importance of having another person present when the patient self-administers" the drugs. *Id.* § 22/35(a)(11)-(13).

73. The attending physician must also document this entire process in the patient's medical record. *Id.* § 22/35(a)(16).

74. And throughout the entire process, the attending physician must "ensure that all steps are carried out in accordance" with EOLOA "before providing a prescription" for lethal drugs. *Id.* § 22/35(a)(13). Thus, the attending physician must not only participate in aiding patients to kill themselves but also supervise and facilitate the whole process—including those roles performed by consulting physicians and mental health professionals.

75. If a physician or facility is "unable or unwilling to carry out" a patient's request for suicide, then they must (1) inform the patient of the refusal to participate, (2) refer the patient "to a health care professional who is able and willing to evaluate and qualify the individual … in accordance with the Health Care Right of Conscience

Act," and (3) document both the patient's request and facility's refusal in the patient's records. *Id.* § 22/70(b); *see also id.* § 22/25(f).

76. Moreover, if the patient is referred to another "able and willing" provider, the statute is equally clear that "[a] transfer of care or medical records does not toll or restart any waiting period" before the two additional requests required by the statute can be made *Id.* §§ 22/25(g), 22/70(b)(2). Thus, the mandatory act of documenting even the initial request continues to function as the first, necessary step in the qualification process.

77. And because the referral provision only covers "evaluat[ing]" and "qualify[ing]" the patient, *id.* § 22/70(b)(2), it does not alleviate healthcare entities of their duty to counsel patients about the "benefits" of suicide, *id.* § 22/15(b), *see also id.* § 22/65(e), (forbidding healthcare entities from "prohibit[ting] a health care professional from … providing information to a patient regarding the patient's health status, including, but not limited to, diagnosis, prognosis, recommended treatment and treatment alternatives, and the risks and benefits of each") or to document their initial request for suicide as the first step toward qualification, *id.* § 22/25(a)(2).

<u>Prescribing</u>

78. Once the patient's requests have been received and documented and the evaluations completed, including the confirmation of mental capacity from the consulting physician and, if applicable, the mental health professional, the attending physician can prescribe the suicide drugs or, "if authorized by the Drug Enforcement Administration, dispense the prescribed medication" directly. *Id.* § 22/35(a)(14)-(15).

79. If sent to a pharmacy, EOLOA instructs that the pharmacist "will dispense the medication, including any ancillary medications, to the qualified patient, or to a person expressly designated by the qualified patient." *Id.* § 22/35(a)(14).

80. Like physicians and facilities, if a pharmacist is "unable or unwilling to carry out" a patient's request for suicide, then he must refer the patient to a pharmacist "who is able and willing" to do so "in accordance with the Health Care Right of Conscience Act." *Id.* § 22/70(b); *see also id.* § 22/10 (defining "[h]ealth care professional" to include pharmacists).

<u>Ingesting</u>

81. As soon as the prescription is filled, the patient may obtain the drugs and commit suicide. *Id.* § 22/35(a)(14).

<u>Death Certificate</u>

82. EOLOA further provides that the cause of death on a patient's death certificate who dies after ingesting suicide drugs "shall be attributed to the underlying terminal disease," and the act of taking suicide drugs "shall not be indicated on the death certificate." *Id.* § 22/90.

<u>Provider Immunity</u>

83. EOLOA also forbids healthcare entities from placing limits on whether healthcare professionals can offer or assist with suicide. No covered healthcare entity may "prohibit a health care professional from … providing information to a patient regarding the patient's health status, including, but not limited to, diagnosis, prognosis, recommended treatment and treatment alternatives, and the risks and

benefits of each," "providing information regarding health care services available pursuant to this Act," "practicing aid-in-dying care outside the scope of the health care professional's employment or contract with the prohibiting entity and off the premises of the prohibiting entity," or "being present, if outside the scope of the health care professional's employment or contractual duties, when" the patient commits suicide. *Id.* § 22/65(e).

84. This provision works in conjunction with the HCRCA's own requirement that all covered facilities maintain protocols outlining how patients will be referred to willing providers if the facility is unable or unwilling to provide the requested service. *See* 745 ILCS § 70/6.1.

<u>Gag Order on Objecting Providers</u>

85. EOLOA imposes extraordinary consequences should an objecting provider fail to comply with its obligations under EOLOA.

86. EOLOA purports to prevent "[c]oercion or undue influence," which it defines as "the willful attempt, whether by deception, intimidation, or"—most importantly—"*any other means*," to "prevent a qualified patient, in a manner that conflicts with the Health Care Right of Conscience Act, from obtaining or self-administering" suicide drugs. 410 ILCS § 22/10 (emphasis added). It goes on to state that healthcare entities and professionals—including physicians and pharmacists—can be held civilly or criminally liable for "[i]ntentionally or knowingly coercing or exerting undue influence on a patient with a terminal disease to … not use medication pursuant to this Act." *Id.* § 22/95(a)(2); *see also id.* § 22/95(c) (defining "intentionally" and

"knowingly"). Thus, providers who wish to advise or counsel patients against participating in suicide risk criminal liability unless they also comply with the HCRCA's mandate to refer the same patients to willing and able providers who will help them commit suicide.

87. EOLOA specifies one way in which entities and healthcare professionals can be held liable for "coercion or undue influence," stating explicitly that "intentionally failing to transfer a patient and the patient's medical records to another health care professional in a timely manner" is deemed to be a "false, misleading, or deceptive practice[ ]" constituting "coercion or undue influence" subject to criminal penalties. *Id.* §§ 22/65(f) (entity obligation), 95(c); *see also id.* § 22/60(f) (healthcare professional obligation).

88. But though EOLOA specifies one specific avenue through which entities and professionals can be held liable, it has hardly provided an exhaustive list of prohibited conduct. To the contrary, EOLOA potentially criminalizes "any … means" used to "prevent a qualified patient … from obtaining or self-administering" drugs. *Id.* § 22/10.

89. If EOLOA opens entities and professionals up to potential criminal liability merely for failing to act by referring a patient to a willing provider, then *a fortiori* a Carmelite Sister for the Aged and Infirm or a Little Sister of the Poor could be held liable for following her religious convictions to actively encourage a resident to consider options other than assisted suicide.

<u>Exemptions</u>

90. As stated above, Illinois' assisted suicide counseling mandate is among the broadest in the nation. Even states like California, Oregon, and Washington do not require doctors to affirmatively raise assisted suicide with their terminally ill patients. *See* Cal. Health & Safety Code §§ 442.5(a)(2), 443.14(e); Or. Rev. Stat. § 127.885; Wash. Rev. Code. § 70.245.190.

91. But Illinois' religious exemptions are also among the narrowest in the nation. Even states like California, Oregon, and Washington allow religious healthcare providers and facilities to opt out of all participation in assisted suicide, if that is what their faith requires. *See* Cal. Health & Safety Code §§ 442.5(a)(2), 443.14(e); Or. Rev. Stat. § 127.885; Wash. Rev. Code. § 70.245.190.

92. By stark contrast, in Illinois, all physicians and facilities must participate in EOLOA and the HCRCA's requirement to inform terminal patients about the "legal treatment" of suicide, including its "benefits." 410 ILCS § 22/15(b); 745 ILCS § 70/6.1(1).

93. And though physicians and facilities can escape some parts of the qualification process, they may do so only by first receiving and documenting the patient's request for death in his medical records—an act that EOLOA defines as the first step in the qualification process. 410 ILCS § 22/70(b)(2)-(3); 745 ILCS § 70/6.1(2)-(3).

94. Nor does Illinois allow religious healthcare facilities to control whether their healthcare professionals participate in assisted suicide at other locations, "prepar[e]"

suicide drugs, or are present during an assisted suicide. 410 ILCS §§ 22/65(e), 22/70(f).

95. To the extent that EOLOA even allows healthcare entities to opt-out, it "must provide advance notice in writing to health care professionals and staff at the time of hiring, contracting with, or privileging and on a yearly basis thereafter." *Id.* § 22/65(c).

EOLOA and the HCRCA's Collective Mandates

96. Through their sweeping obligations and limited exemptions, EOLOA and the HCRCA collectively impose the following seven mandates on healthcare institutions and professionals with religious objections to assisting their patients in committing suicide:

- **Suicide Information and Counseling Mandate:** Physicians and facilities must counsel terminal patients about the availability and benefits of killing themselves or else be held potentially criminally liable.
- **Suicide Qualification Mandate:** Physicians and facilities must assist any requesting terminal patient to qualify for assisted suicide by documenting the patient's request for suicide and the date of that request in his medical records, which serves as the necessary first step in the death process.
- **Suicide Drug Prescription and Ingestion Mandate:** Pharmacies are required to dispense lethal drugs to patients, and facilities that are not covered by EOLOA's opt-out provision, such as assisted living facilities and

hospice programs, must permit the prescription and ingestion of suicide drugs on their premises.

- **Suicide Referral Mandate:** Physicians and facilities who do not wish to participate in the full gamut of qualifying a patient for suicide, and any physician, pharmacist, or facility uninterested in participating in the Suicide Prescription and Ingestion Mandate, must refer patients to an "able and willing" provider or else be held criminally liable.
- **Gag Order:** Physicians, pharmacists, and facilities that encourage their dying patients to live to the end of their natural life instead of pursuing assisted suicide may be held civilly or criminally liable.
- **False Death Certificate Mandate:** Providers signing death certificates must state that the underlying terminal disease was the patient's cause of death, rather than the drugs that actually ended his life.
- **Unfaithful Provider Mandate:** Covered healthcare facilities may not take adverse actions against providers who speak and act in ways permitted by EOLOA, even when those actions are directly contrary to a facility's religious beliefs.

Liability

97. Violating EOLOA has significant consequences. As already described, the Act exposes healthcare entities and professionals to both "civil" and "criminal liability" for "[i]ntentional misconduct" and for "coercing or exerting undue influence" on a patient to "not use medication." *Id.* §§ 22/65(b), 22/95(a)(3).

98. But the consequences do not end there.

99. Physicians, for example, can have their license revoked, suspended, or put on probation by the Department of Financial and Professional Regulation under the Medical Practice Act of 1987. *See* 225 ILCS § 60/22(A) (1)-(50). Among other things, punishable conduct includes the use of false or deceptive statements, recording false records, making misleading statements on the "value of" a particular medicine or treatment, and engaging in unethical or unprofessional conduct. *Id.* § 60/22(A)(4), (5), (10), (21), (31).

100. For each violation of the Medical Practice Act, the Department of Financial and Professional Regulation can impose a fine of up to $10,000. *Id.* § 60/22(A).

101. Illinois defines "unethical" and "unprofessional" conduct to include "any … act or omission that breaches the physician's responsibility to a patient according to accepted medical standards of practice" or the failure to "generate medical records for any patient encounter and/or care as specified by accepted medical standards." Ill. Admin. Code tit. 68, § 1285.240(a)(1), (2)(E), (P).

102. If a physician loses his license, Secretary Treto, through the Attorney General, can seek an injunction to stop that person from continuing medical practice. 225 ILCS § 60/61.

103. Nurses face similar penalties. The Department of Financial and Professional Regulation, under the Nurse Practice Act, can revoke, suspend, or place a nurse's license on probation for certain specified violations. 225 ILCS § 65/70-5. These violations include, among other things, engaging in unethical or unprofessional

conduct, gross negligence, failure to maintain proper records of patient care, and making false statements on the value of a medication or treatment. *Id.* § 65/70-5(b)(7), (14), (19), (32). Each violation carries a fine of up to $10,000, *id.* § 65/70-5(a), and the possibility of criminal sanctions, *id.* § 65/70-150.

104. Similar to physicians, Illinois defines "unethical" or "unprofessional" conduct for nurses to include "[e]ngaging in conduct likely to deceive, defraud or harm the public" and "[e]ngaging in activities that are violative of ethical standards of the profession," "such as … not respecting the rights of patients." Ill. Admin. Code tit. 68, § 1300.90(a).

105. If a nurse violates the Nurse Practice Act, Secretary Treto, through the Attorney General, can seek an order enforcing compliance with the act. 225 ILCS § 65/70-75(a).

106. Nursing homes can likewise be punished by the Department of Public Health under the Nursing Home Care Act. 210 ILCS § 45/1. Abuse of a resident, defined as "any physical or mental injury," is punishable by a host of sanctions. *Id.* § 45/1-103. Depending on the severity of the offense, homes can lose their license or be limited to a conditional license and forced to comply with a "correction plan." Each offense also carries a fine ranging from $200 to up to $12,500 per violation. *Id.* § 45/3-305.

107. And, if a nursing home continues to operate while violating the Nursing Home Care Act, the Director of the Department of Public Health, through the

Attorney General, may "bring action for an injunction to restrain such violation or to enjoin the future operation or maintenance of any such facility." *Id.* § 45/3-701.

108. Pharmacists and pharmacies, under the Pharmacy Practice Act, can similarly have their licenses revoked, suspended, or put on probation by the Department of Financial and Professional Regulation. 225 ILCS § 85/11(b), 85/30. Punishable conduct includes, among other things, "[a] pattern of conduct which demonstrates … unfitness to practice," "[e]ngaging in unprofessional, dishonorable, or unethical conduct of a character likely to deceive, defraud, or harm the public," and "[i]nterfering with the professional judgment of a pharmacist." *Id.* § 85/30(a)(4), (7), (23). Each violation carries a fine of up to $10,000, *id.* § 85/30(a), as well as criminal sanctions, *id.* § 85/35.19.

109. Similar to other health care professionals, Illinois defines "[u]nprofessional and unethical conduct" for pharmacists to include "[c]omitting any other act or omission that breaches the pharmacist's responsibility to a patient according to the accepted standard of care in pharmacy practice." Ill. Admin. Code tit. 68, § 1330.30, 30(t).

110. If any person violates the Pharmacy Practice Act, Secretary Treto, through the Attorney General, can seek an order enforcing compliance with the act. 225 ILCS § 85/35.1(a).

111. For its part, the HCRCA permits "[a]ny person" to bring an action and recover either treble damages "including pain and suffering," "the costs of the suit[,] and reasonable attorney's fees," or "$2,500 for each violation in addition to costs of

the suit and reasonable attorney's fees," whichever is greater. 745 ILCS § 70/12. "These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law." *Id.*

***The Catholic Church's Teachings on End-of-Life Care***

112. The Catholic Church teaches that all people possess human dignity because they are created in the image and likeness of God.[11] This dignity cannot be destroyed: it "prevails in and beyond every circumstance, state, or situation the person may ever encounter."[12]

113. Catholic healthcare professionals are called to uphold that dignity, accompanying each dying person with love as they live out their last days: "to cure if possible, always to care."[13]

114. The Catholic Church recognizes the deep suffering that often accompanies serious, and especially terminal, illness. The loss of autonomy, fear of becoming a burden, profound loneliness and grief, and despair are too often factors motivating the "anguished plea[s] for help and love" that become requests to end one's life.[14] The Church calls upon Catholic believers to address these deeply human concerns not by

---

11 Catechism of the Catholic Church §§ 357, 1701 (CCC).

12 Dicastery for the Doctrine of the Faith, *Declaration "Dignitas Infinita"* (*"Infinite Dignity"*) *on Human Dignity* ¶ 1 (Apr. 2, 2024) (*Dignitas infinita*), https://perma.cc/RN2R-FT6G (formerly known as the Congregation for the Doctrine of the Faith).

13 Congregation for the Doctrine of the Faith, *Samaritanus bonus* (*The Good Samaritan*) § I (July 14, 2020), https://perma.cc/6F56-QEXR.

14 Sacred Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* § II (May 5, 1980) (*Iura et bona*), https://perma.cc/FEH4-37E8.

abandoning the person who is suffering, but by working to dispel these lies, "surround[ing]" the dying person with "a loving human and Christian presence," so that they "can overcome all forms of depression and need not succumb to the anguish of loneliness and abandonment to suffering and death."[15]

115. Such compassionate care ministers to every aspect of the human person—physical symptoms, emotional well-being, and spiritual preparation—ensuring that dying patients enjoy maximum quality of life and are accompanied by love and hope as they face death.

116. Catholics are called especially to help those who are facing death to prepare spiritually for their last days.

117. The Church recognizes that "[v]ery often illness provokes a search for God and a return to him."[16] Catholic healthcare providers and caregivers offer compassionate care that allows dying individuals to engage in this vital search, free from coercion or pressure. Indeed, faithful Catholics will often seek out Catholic healthcare providers and caregivers *because of* their ability to receive this care in such settings, which allows them to live out their faith until their natural death.

118. Catholic providers and caregivers are also called to minister to every dying patient as though he is Jesus Christ himself. *See Matthew* 25:40 ("Amen, I say to you, **whatever you did for one of these least brothers of mine, you did for me**." (emphasis added)). Catholic healthcare providers thus tend to the sick as

---

[15] *Samaritanus bonus* § V.1.

[16] CCC § 1501.

Christ's disciples did during his own death: lovingly giving them food and drink, tending their wounds, lightening the burden of sickness where possible, and, above all, ensuring they are never alone. By "'remain[ing]' at the bedside of the sick to bear witness to their unique and unrepeatable value," just as Christ's mother and disciples remained at the foot of the Cross, Catholic healthcare providers help to dispel the creeping despair that often accompanies serious illness.[17]

119. Catholics also see in dying patients the hope that their suffering is not in vain. Here, too, Catholics look to Jesus Christ for guidance and consolation. Catholics believe that as he suffered, Christ also bore witness to hope that "*in* history[,] the last word never belongs to death, pain, betrayal, and suffering."[18]

120. By "'remaining' by the side of the sick," Catholic healthcare providers and caregivers embody "a sign of love and of the hope that it contains. The proclamation of life after death is not an illusion nor merely a consolation, but a certainty lodged at the center of love that death cannot devour."[19]

121. The Church believes that the act of suicide, by whatever means and buried under whatever euphemisms, stands directly contrary to this respect for human dignity. The Church acknowledges that "[g]rave psychological disturbances, anguish, or grave fear of hardship, suffering, or torture" can often motivate the decision to intentionally end one's life, all of which can "diminish the responsibility" for the act.[20]

---

17 *Samaritanus bonus* § II.

18 *Id.*

19 *Id.*

20 CCC § 2282.

Nevertheless, suicide remains a grave sin as a rejection of the gift of life God has granted through his creative power and desire for a loving relationship with his creation.[21]

122. Physician-assisted suicide is no different.

123. As a matter of "definitive teaching," the Church has stated "that euthanasia is a *crime against human life*" that is "an intrinsically evil act, in every situation or circumstance."[22]

124. As expressed in the Catechism of the Catholic Church, euthanasia "constitutes a murder gravely contrary to the dignity of the human person and to the respect due to the living God, his Creator."[23] It "must always be forbidden and excluded," even if performed "in good faith," as "morally unacceptable" and a "grave sin against human life."[24]

125. Because euthanasia constitutes "an act of homicide that no end can justify," "any form of complicity or active or passive collaboration" is also a grave sin.[25] As the Church has explained, "helping the suicidal person to take his or her own life is an objective offense against the dignity of the person asking for it, even if one would be thereby fulfilling the person's wish" because "[e]ven in its sorrowful state, human life

---

21 *See id.*

22 *Samaritanus bonus* § V.1. The Church defines euthanasia as "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated." *Iura et bona* § II.

23 CCC § 2277.

24 *Id.*; *Samaritanus bonus* § V.1.

25 *Samaritanus bonus* § V.1.

carries a dignity that must always be upheld, that can never be lost, and that calls for unconditional respect."[26]

126. Consistent with these teachings, the United States Conference of Catholic Bishops and Bishops throughout the country have long opposed physician-assisted suicide and its legalization.[27] That includes opposing Illinois' EOLOA both before and after its passage.[28] Indeed, Pope Leo XIV has publicly denounced the practice, stating that he, along with Cardinal Cupich, "explicitly" spoke with Governor Pritzker about the "necessity to respect the sacredness of life from the very beginning to the very end," and asked the governor to veto the bill.[29]

***The Ethical and Religious Directives for Catholic Health: Binding Guidance for Catholic Healthcare in the U.S.***

127. To guide American Catholic healthcare providers and facilities in following Catholic teaching about human dignity, the United States Conference of Catholic Bishops has published the Ethical and Religious Directives for Health Care Services.

---

[26] *Dignitas infinita* § 52.

[27] U.S. Conf. of Catholic Bishops, *Top Reasons to Oppose Assisted Suicide* (2017), https://perma.cc/2AUK-SEJX; Salvatore R. Matano, *Statement by the Most Reverend Salvatore R. Matano Ninth Bishop of Burlington Regarding the Legalization of Doctor-Prescribed Suicide*, U.S. Conf. of Catholic Bishops (May 20, 2013), https://perma.cc/QK56-FY9V; Massachusetts Catholic Conf., *Catholic Bishops Oppose "Death with Dignity" Initiative Petition*, Roman Catholic Diocese of Worcester (Sep. 7, 2011), https://perma.cc/PC9H-Z8WJ.

[28] Catholic Conf. of Illinois, *Stop Assisted Suicide: A Better Way Forward – A Message from the Catholic Bishops of Illinois* (Feb. 2025), https://perma.cc/FM6D-2NAZ; Catholic Conf. of Illinois, *Illinois Takes Dangerous Path with Legalization of Assisted Suicide* (Dec. 12, 2025), https://perma.cc/35FE-LJL7.

[29] Paolo Santalucia, *Pope Expresses Disappointment Over Approval of Assisted Suicide Legislation in His Home State of Illinois*, Chicago Tribune (Dec. 23, 2025), https://perma.cc/AQJ5-29S9.

The Ethical and Religious Directives "reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person" and "provide authoritative guidance on certain moral issues that face Catholic health care today."[30]

128. The Ethical and Religious Directives emphasize that "Catholic health care services have a duty to provide end-of-life care in keeping with Catholic teaching."[31]

129. Thus, and consistent with Church teaching, the Ethical and Religious Directives categorically state that "Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way,"[32] because "[s]uicide and euthanasia … are never morally acceptable options."[33] Instead, such institutions must offer "[d]ying patients who request euthanasia … loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death."[34]

130. Bolstering this point, the Ethical and Religious Directives further state that "formal cooperation" in gravely immoral actions "is always morally wrong."[35] Such cooperation occurs "not only when the cooperator shares the intention of the

---

[30] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* 4 (7th ed. 2025) (*Ethical and Religious Directives*), https://perma.cc/A7F8-DYLP.

[31] *Id.* at 28 (Directive 62).

[32] *Id.* at 27 (Directive 59).

[33] *Id.* at 25.

[34] *Id.* at 27 (Directive 59).

[35] *Id.* at 31.

wrongdoer, but also when the cooperator directly participates in the immoral act, even if the cooperator does not share the intention of the wrongdoer, but participates as a means to some other end."[36] Formal cooperation includes, but is not limited to, "authorizing [it]" and "giving specific direction about carrying it out."[37]

131. The Ethical and Religious Directives extend far beyond prohibiting only formal cooperation. They also state plainly that "Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as … euthanasia [and] assisted suicide," which they identify as "the most pressing concerns" facing such facilities and their patients.[38]

132. Material cooperation occurs even where "the one cooperating neither shares the wrongdoer's intention in performing the immoral act nor cooperates by directly participating in the act as a means to some other end."[39] If the facility "contributes to the immoral activity in a way that is causally related but not essential to the immoral act itself," material cooperation has occurred.[40]

133. This includes referral. When a patient "requests a medical intervention that is not in accord with Catholic teaching, health care professionals may not refer the patient to another professional for the purpose of obtaining that intervention."[41]

---

[36] *Id.*

[37] *Id.*

[38] *Id.* at 32 & n. 76 (Directive 70).

[39] *Id.* at 31.

[40] *Id.*

[41] *Id.* at 16 (Directive 27).

They may, however, help to "facilitate" a safe "transfer of care to another health care professional or facility that [the patient] has independently chosen," so long as they "avoid[ ] immoral cooperation."[42] Thus, while a Catholic healthcare facility would not prohibit a person from leaving the facility or from transferring records to another facility, a Catholic facility would not actively aid the person in locating or reaching another facility in order to obtain immoral treatments.

134. Finally, the Ethical and Religious Directives impose on healthcare facilities the duty to avoid the sin of scandal, which the Church defines as "an attitude or behavior which leads another to do evil."[43] *See Matthew* 18:6. Catholics view scandal as always wrong for the example it sets. And scandal becomes a "grave offense if by deed or omission another is deliberately led into a grave offense."[44] The moral wrong of scandal also "takes on a particular gravity by reason of the authority of those who cause it or the weakness of those who are scandalized."[45]

135. Under the Ethical and Religious Directives, facilities must avoid actions that could "lead people to conclude that [immoral] activities are morally acceptable," thus "lead[ing] people to sin."[46] Actions must also be "refused … because the Church's witness might be undermined."[47]

---

[42] *Id.*

[43] CCC § 2284.

[44] *Id.*

[45] *Id.* at § 2285.

[46] *Ethical and Religious Directives*, 31.

[47] *Id.* at 33 (Directive 71).

136. To ensure these Directives are implemented cohesively in accordance with the Catholic Church's beliefs, the Ethical and Religious Directives also state that "[e]mployees of a Catholic health care institution must respect and uphold the religious mission of the institution," "adhere to these Directives," and "promote the institution's commitment to human dignity and the common good."[48]

***Carmelite Sisters for the Aged and Infirm***

137. The Carmelite Sisters for the Aged and Infirm was founded in 1929 by Venerable Mother Angeline Teresa after she felt a calling from God to care for elderly people of every socioeconomic status.

138. Venerable Mother Angeline believed that the elderly often feel alone and frightened, and that deep human connection is the best way to dispel these fears.

139. Governed by the philosophy that "the difference is love," Mother Angeline worked to create healthcare facilities that "clasp the hand of an aged person and give meaning to the autumn of life."[49]

140. Today, the Carmelite Sisters continue to strive to be a mother, a sister, a daughter and a friend to someone who is another's mother, sister, friend and loved one, "provid[ing] the full support of the human family of which every person is worthy."[50] In this way, they minister to the elderly as though they are ministering to

---

[48] *Id.* at 11 (Directive 9).

[49] The Congregation of The Carmelite Sisters for the Aged and Infirm, *Mission and Core Values* (2025).

[50] The Congregation of The Carmelite Sisters for the Aged and Infirm, *Constitutions* at 98 (1986) (Carmelite Sisters' Constitution).

Christ, "car[ing] for the aged and infirm with the same love and joy they would show in caring for the Lord."[51]

141. At the same time, they also serve as though they are "bring[ing] Christ to every old person under [their] care."[52] As Mother Angeline explained, "Bringing Christ means giving them His compassion, His interest, His loving care, His warmth—morning, noon and night!"[53]

142. The Carmelite Sisters now serve in thirteen facilities across seven states and Ireland, all of which serve the aged of every socioeconomic class, "regardless of religious belief or affiliation."[54]

143. One home, St. Patrick's Residence, is located in Illinois. Open since 1964, St. Patrick's is a 192-bed licensed skilled nursing facility offering long-term care and rehabilitation services located in Naperville.

144. Four Carmelite Sisters serve at St. Patrick's, providing critical care to each resident on a daily basis. One Sister is a Licensed Practical Nurse, another is a Registered Nurse, and two work in pastoral care.

145. At St. Patrick's, the Carmelite Sisters care for the spiritual needs of each resident by offering daily Mass as well as services in other faith traditions. They pray

---

51 *Id.* at 38.

52 *Id.*

53 *Id.*

54 The Congregation of The Carmelite Sisters for the Aged and Infirm, *Guiding Principles* at 1.

daily with residents, and they increase those prayerful efforts as a resident approaches death. At the Carmelite Sisters' homes no resident ever dies alone.

146. The Carmelite Sisters continue to honor and respect the dignity of their residents even after death. After a resident dies, a special covering called a pall is placed over the body, in recognition that something sacred has just taken place. The Carmelite Sisters and their staff then accompany the resident's family as the resident's body departs the home as a continuation of their vigil of love.

147. The Carmelite Sisters often celebrate the funeral Masses of their residents within their own chapel. After each funeral Mass, the Carmelite Sisters and any who wish to join them process down the aisle of the chapel, chanting "Jesus, remember me as you come into your kingdom." The Sisters then publicly thank the resident's loved ones for the privilege of being able to honor and serve the deceased resident.

148. Residents and their families choose to seek admission at the Carmelite Sisters' homes because of the Catholic healthcare they provide. The loved ones of residents often choose to volunteer at St. Patrick's, even after their loved one has passed away, as a sign of the gratitude they feel toward the care their loved one received while under the Carmelite Sisters' care.

149. The Carmelite Sisters see the fruits of the loving—and life-giving—care with which they surround their residents. When residents have had to transfer to another facility for medical care, the Sisters have observed that some have notably declined in their physical health or state of mind while away and experience renewal when they are able to return.

150. St. Patrick's qualifies as a health care entity under EOLOA and as a health care facility under the HCRCA.

151. The Carmelite Sisters currently care and will care for those who have or who will have a terminal disease as defined by the End-of-Life Options Act at St. Patrick's.

152. The Carmelite Sisters receive federal funding as defined by the Assisted Suicide Funding Restriction Act of 1997. 42 U.S.C. § 14402(d).

153. The Carmelite Sisters serve residents with disabilities as defined by the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).

154. The Carmelite Sisters serve veterans.

155. The Carmelite Sisters "uphold the authentic teaching of the Roman Catholic Church and philosophy of [their] Foundress, Mother M. Angeline Teresa, regarding the value and right to life of each person from conception throughout the stages of living."[55] They further believe that this sanctity of life cannot be inhibited by limitation, disease, or condition, but is a "basic right" belonging to every person.[56]

156. The Carmelite Sisters uphold this sanctity of life in every aspect of their care for the elderly. This means that they believe "each person is special, a unique being, created by the Almighty as the object of His personal love. Since life is a gift from God, the human person is worthy of respect and dignity in all stages—from

---

55 Carmelite Sisters' Constitution at 97.

56 *Id.* at 39.

conception to death—and entitled to quality in care of the whole person, body, mind and soul."[57]

157. This also means that the Carmelite Sisters believe that "sickness, suffering and death" can become "potential occasions of experiencing God," especially when accompanied by "hope, healing and comfort."[58]

158. Finally, because of their Catholic beliefs, the Carmelite Sisters "do not hasten[,] nor do [they] prolong[,] the dying process."[59] But because of their belief "that the life of every human being is sacrosanct," they view euthanasia and assisted suicide as "unconscionable and totally unacceptable."[60] They have therefore "publicly state[d] that [they] are opposed to … euthanasia [and] assisted suicide."[61]

159. In keeping with these beliefs, the Carmelite Sisters and each of their homes follow the Ethical and Religious Directives.[62]

160. The Carmelite Sisters' adherence to the Ethical and Religious Directives is reflected, among other things, in their Guiding Principles, their Mission and Core Values, their Constitution, and their Statement on the Sanctity of Life, as well as St. Patrick's bylaws.

---

[57] *Id.* at 95.

[58] *Id.* at 96.

[59] *Id.* at 98.

[60] *Id.* at 39.

[61] *Mission and Core Values* at 1.

[62] *Guiding Principles* at 1.

161. Consistent with Catholic doctrine and the Ethical and Religious Directives, the Carmelite Sisters believe that committing suicide, or helping to assist in that decision, is gravely immoral. They therefore take several steps to prevent any formal or material cooperation with assisted suicide at St. Patrick's Residence.

162. Because of the Carmelite Sisters' beliefs about the sanctity of life, they do not allow employees, volunteers, medical providers, or clinical contractors, while providing care in their home:

- to inform residents about, or to discuss with residents, the option to end their lives with lethal drugs;
- to take any other step that would facilitate the provision of lethal drugs to their residents for the purpose of ending their lives;
- to assist a resident in qualifying for the drugs used to end life by recording oral or written requests for those drugs in the residents' medical files;
- to certify or to examine residents in order to certify their fitness to receive lethal drugs in order to end their lives;
- to prescribe or order lethal drugs to a resident for the purpose of voluntarily ending the residents' own lives;
- to allow residents to self-administer lethal drugs at their homes for the purpose of ending their own lives; or
- to be present when residents use lethal drugs to end their own lives.

The Carmelite Sisters consider each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

163. If confronted with a request for assisted suicide, the Carmelite Sisters would instead meet the request with compassion and love, endeavoring to understand the reasons behind the request and to identify the supports that could be provided to ameliorate those concerns. Most of all, the Carmelite Sisters would wish to reiterate to their resident that they are loved and not alone, that their life has meaning, and that they will accompany the resident through any illness, focusing on alleviating all kinds of pain they may experience. The Sisters would remind the resident that they are loved by God and are worthy of compassionate care until natural death and that pursuing suicide is not in keeping with the resident's inherent dignity and innate value as a beloved child of God.

164. The Carmelite Sisters will not prevent a resident from transferring out of St. Patrick's to undertake the process of obtaining lethal drugs to commit suicide at another healthcare facility of the resident's choosing, nor will they refuse to transfer a resident's records to a new provider or facility if the resident has already independently identified a new provider or facility.

165. However, because of the Carmelite Sisters' beliefs about the sanctity of life, they will not allow employees, volunteers, medical providers, or clinical contractors providing care in their home to help a resident to locate or identify a provider who will assist in their efforts to receive lethal drugs to commit suicide. The Sisters would consider this to be cooperation with the evil of assisted suicide and cause grave scandal.

166. Taken together, all of these measures allow the Carmelite Sisters and their providers to engage in a healthcare ministry consistent with their sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of the Carmelite Sisters' adherence to Catholic teaching that they are able to offer patients a healthcare setting where they can live, for as long as they will, by their own beliefs.

***The Little Sisters of the Poor***

167. The Little Sisters of the Poor (the Little Sisters) are an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly people of any race, sex, or religion for over 185 years.[63]

168. The Little Sisters were founded in France, in the winter of 1839, when St. Jeanne Jugan carried a blind elderly woman off the streets and into her home and laid the woman in her own bed. Over time, other women joined St. Jeanne in a religious ministry to protect and care for the elderly poor.[64]

169. By the time St. Jeanne died forty years later, the Little Sisters of the Poor had established homes in eight countries, including the United States, where the first home was founded in 1868 in Brooklyn, New York.

170. The Little Sisters first came to Illinois in 1876 at the invitation of Bishop Thomas Foley to minister to those still devastated by the Great Chicago Fire and have maintained a faithful presence in Illinois ever since.

---

[63] Little Sisters of the Poor, *Little Sisters of the Poor Mission and Vision* (2023).

[64] *Id.*

171. Today, the Little Sisters oversee their work in the State of Illinois through the Little Sisters of the Poor Chicago Province, Inc.

172. The Little Sisters serve the people of Illinois in two locations: St. Mary's Home and Jugan Terrace (in Chicago) and St. Joseph's Home and the Jeanne Jugan Independent Living Apartments (in Palatine).

173. St. Mary's Home is a 57-bed facility offering 24/7 skilled nursing care to impoverished residents aged 65 or older, regardless of race, nationality, or religion. The Sisters also operate Jugan Terrace, a 50-apartment independent living community that accommodates needy elderly who can maintain an independent lifestyle, in Chicago.

174. At St. Mary's, twelve Sisters, two of whom are registered nurses, live with the residents and help to provide them with care.

175. St. Joseph's Home is a 49-bed skilled licensed nursing facility offering care to impoverished residents aged 65 or older, regardless of race, nationality, or religion. The Sisters also operate the Jeanne Jugan Independent Living Apartments, an independent living community consisting of 34 apartments.

176. At St. Joseph's, seventeen Sisters, one of whom is a registered nurse, live with and provide care to the residents.

177. St. Mary's and St. Joseph's are health care entities under EOLOA and health care facilities under the HCRCA. Jugan Terrace and Jeanne Jugan Independent Living Apartments are not covered by either Act.

178. The Little Sisters trust in God's providence and the kindness of others to provide for their residents' needs.

179. The Little Sisters are mindful that Jesus taught that "whatever you did for one of these least brothers of mine, you did for me." *Matthew* 25:40. This teaching is a fundamental part of who the Little Sisters are. St. Jeanne urged her fellow Little Sisters, "Never forget that the poor are Our Lord; in caring for the poor say to yourself: This is for my Jesus—what a great grace!" Thus, each Little Sister makes a vow of Hospitality, through which she promises to care for the aged as if they were Christ himself. The Little Sisters also carry out this hospitality by living in the Homes alongside their residents, sharing a common life in love.

180. The Little Sisters strive to witness to the value of the elderly by believing in and advocating for their inviolable dignity, by recognizing their unique contributions to the Church and society, and by involving them in the activities of their Homes to develop their human potential.

181. The Little Sisters "are committed to safeguarding life in all its stages." The Little Sisters "serve the elderly in an atmosphere mindful of authentic respect for life and for the freedom of individual persons." Consistent with that commitment, the Little Sisters "categorically reject the practice of euthanasia in all its forms including physician-assisted suicide."[65]

182. Caring for the dying is the summit of the Little Sisters' service to the elderly poor. Whenever death can be foreseen, no one dies alone in a Little Sisters home. The

---

[65] Little Sisters of the Poor, *At the Service of the Gospel of Life* at 2 (2023).

Little Sisters maintain a constant presence with those who have entered the dying process and their families. The Sisters try to relieve their sufferings as much as possible, which includes giving emotional and prayerful support, and often surrounding a dying resident with song and prayer until her final breath.

183. Because the Little Sisters care for those who are weak and dying, they strive to emphasize their respect for the uniqueness and dignity of each elderly person as they reach the end of their life. They offer this respect for two reasons. First, to treat the individual with the dignity they are due as a person loved and created by God, with the same respect and compassion as if he or she was Jesus Christ. Second, to convey a public witness of respect for life, in the hope that they can help build a Culture of Life in our society.

184. All Little Sisters facilities share the same fidelity to the teachings of the Catholic Church. Each is operated under the control of the Little Sisters, and every Little Sister takes a vow of obedience to God, which assumes obedience to the Pope, the Church's teachings, and the authority of the Church in her hierarchy.

185. The Little Sisters care for their residents "until natural death."[66] In their homes, "[a]ll services rendered … will be supportive of life." As such, "[a]ctions directed toward terminating or shortening life will be at no time permitted or performed." Residents "agree to adhere to [the Little Sisters'] Position concerning the protection of all human life."[67]

---

[66] *Little Sisters of the Poor Mission and Vision* at 2.

[67] Little Sisters of the Poor, *Advance Directives: Facility Statement on Care of the Sick and Dying*, (2016).

186. Patients and their families have told the Little Sisters that they have chosen to live in their Homes because of the Catholic healthcare they provide.

187. The Little Sisters currently care for and will care for those who have a terminal disease as defined by EOLOA and the HCHRA at their Homes.

188. The Little Sisters serve patients with disabilities as defined by the Americans with Disabilities Act. *See* 42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).

189. The Little Sisters receive federal funding as defined by the Assisted Suicide Funding Restriction Act of 1997. *See* 42 U.S.C. § 14402(d).

190. The Little Sisters serve veterans.

191. The Little Sisters follow the Ethical and Religious Directives of the Catholic Church in their operation and provision of health care.[68]

192. Residents and employees are told about the Little Sisters' Catholic religious beliefs during their orientation and continue to learn about those beliefs through regular religious activities at the homes, including daily Mass, praying the rosary, celebrating feast days, and other forms of communal prayer.

193. Consistent with Catholic doctrine and the Ethical and Religious Directives, the Little Sisters believe that committing suicide, or helping to assist in that decision, is gravely immoral. They therefore take several steps to prevent any formal or material cooperation with the evil of assisted suicide.

---

[68] *Id.*

194. Because of the Little Sisters' beliefs about the sanctity of life, they do not allow employees, volunteers, medical providers, or clinical contractors, while providing care in their Homes:

- to inform residents about, or to discuss with residents, the option to commit suicide with lethal drugs, either on- or off- the Little Sisters' premises;
- to take any other step that would facilitate the provision of lethal drugs for the purpose of ending one's life;
- to assist a resident in qualifying for the drugs used to end life by recording an oral or written requests for lethal drugs in a resident's medical file;
- to certify or to examine residents in order to certify their fitness to receive lethal drugs in order to end their lives;
- to prescribe or order lethal drugs to a resident for the purpose of voluntarily ending the resident's own life;
- to allow residents to self-administer lethal drugs on the Little Sisters' premises for the purpose of ending their own lives; or
- to be present when residents use lethal drugs to end their own lives.

The Little Sisters consider each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

195. If confronted with a request for assisted suicide, the Little Sisters would instead meet the request with compassion and love, endeavoring to understand the reasons behind the request and to identify the supports that could be provided to ameliorate those concerns. Most of all, the Little Sisters would wish to reiterate to

their resident that they are loved and not alone, that their life has meaning, and that pursuing suicide is not in keeping with their inherent dignity and innate value as a beloved child of God.

196. The Little Sisters will not prevent a resident from transferring out of their homes to undertake the process of obtaining lethal drugs at another healthcare facility of his or her choosing. Nor will they refuse to transfer a resident's medical records to a new provider or facility if the resident has already independently identified a new provider or facility.

197. However, because of the Little Sisters' beliefs about the sanctity of life, they will not allow employees, volunteers, medical providers, or clinical contractors, while providing care at their Homes, to help a resident to locate or identify a provider who will assist them in obtaining lethal drugs. The Little Sisters consider this to be cooperation with the evil of assisted suicide and grave scandal.

198. Taken together, all of these measures allow the Little Sisters to care for the elderly poor in a manner consistent with their and their residents' sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of the Little Sisters' and their employees' and volunteers' adherence to Catholic teaching that they are able to offer residents a setting where they can live, for as long as they will, by their own beliefs.

***Cardinal Cupich and the Archdiocese of Chicago***

199. Formed as a diocese in 1843 and elevated to an archdiocese in 1880, the Archdiocese of Chicago (the Archdiocese) makes up the presence of the Roman Catholic Church in Cook and Lake Counties.

200. The Archdiocese serves around 2 million people across both counties, including approximately 1.95 million baptized Catholics across 216 parishes.

201. For decades, the Archdiocese has diligently ministered to members of the Illinois community, regardless of their religious affiliation. To provide just one example, more than one hundred and forty Archdiocesan schools provide educational opportunities for children and youth.

202. Since 2017, His Eminence Blase Cardinal Cupich has served as the ninth Archbishop of the Archdiocese of Chicago.

203. Among his spiritual responsibilities as shepherd for the Archdiocese, Cardinal Cupich oversees the ministry of Catholic healthcare within the Archdiocese.[69]

204. Cardinal Cupich's responsibility for healthcare means that "the ultimate responsibility for interpreting and applying" the Ethical and Religious Directives for Catholic Healthcare "rests with" him.[70]

205. This in turn means Cardinal Cupich has the "obligation to ensure doctrinal and moral integrity in the witness and practice of all Catholic institutions within the diocese," including that all Catholic healthcare institutions follow the Ethical and Religious Directives.[71]

---

69 *See* United States Conference of Catholic Bishops Administrative Committee, *The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry* at 3 (2d ed. 2020) (*The Pastoral Role of the Diocesan Bishop*); *Ethical and Religious Directives* at 6-7.

70 *Ethical and Religious Directives* at 32.

71 *The Pastoral Role of the Diocesan Bishop* at 3.

206. In carrying out this responsibility, Cardinal Cupich is committed to enforcing the Ethical and Religious Directives, which are binding under canon law, within the Archdiocese.

207. The Cardinal's consent is required before any healthcare facility may "claim the name Catholic" in his Archdiocese.[72] He also has the authority to withdraw that consent at any time if a healthcare facility is acting inconsistently with the Church's beliefs.[73]

208. Cardinal Cupich also "oversees the sacramental care of the sick" within his Diocese.[74] This includes the Sacrament of Extreme Unction, also known as Last Rites, wherein a dying person receives special prayers, anointings, and blessings in preparation for death. *See, e.g.*, *James* 5:14-15. Where necessary and possible, the dying person also receives the Sacrament of Confession—wherein his sins are forgiven and he is fully reconciled with God—and the Sacrament of the Eucharist (called Viaticum, literally "food for the journey" to the next life).[75]

209. To carry out these spiritual responsibilities, Cardinal Cupich leads a wide range of efforts with Catholic healthcare institutions within the Archdiocese designed to ensure that the Catholic identity and mission of these institutions continue to flourish.

---

72 Code of Canon Law, c. 216.

73 *See id.* at c. 300.

74 *Ethical and Religious Directives* at 7.

75 Code of Canon Law, cc. 921-22.

210. In the wake of Illinois' passage of its assisted-suicide act, Cardinal Cupich exercised his obligations to the faithful generally, and to Catholic healthcare institutions under his spiritual care specifically, by reminding them that "[t]here is a way to both honor the dignity of human life and provide compassionate care to those experiencing life-ending illness" *without* encouraging them them to kill themselves.[76]

211. Taken together, all of these measures allow Cardinal Cupich to provide spiritual leadership to a healthcare ministry consistent with the Church's sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of this adherence to Catholic teaching that Cardinal Cupich and his Archdiocese are able to ensure the catholicity of a healthcare setting where patients can live, for as long as they will, by their own beliefs.

***Luke Vander Bleek and Fitzgerald Pharmacy***

212. Since earning his Bachelor of Science degree in pharmacy from the University of Illinois in 1986, Luke Vander Bleek has sought to use his pharmaceutical skills to serve and heal the members of his community.

213. Vander Bleek is the president and sole shareholder of Morr-Fitz, Inc., which operates Fitzgerald Pharmacy, a community pharmacy located in Morrison, Illinois.

214. Fitzgerald Pharmacy is a covered healthcare facility under the HCRCA.

[76] Blase J. Cupich, *Statement of Cardinal Blase J. Cupich, archbishop of Chicago, on SB 150 Assisted Suicide Bill*, Archdiocese of Chicago (May 30, 2025), https://perma.cc/5DKQ-MH6C.

215. Fitzgerald Pharmacy currently employs two full-time pharmacists, with Vander Bleek also working as a pharmacist part-time. These pharmacists are covered healthcare professionals under EOLOA.

216. Vander Bleek's desire to bring healing to his community stems from his Catholic faith.

217. Vander Bleek's Catholic faith also guides how he operates his pharmacy. He opted to open a community pharmacy precisely because he believes that model enables him to bring healing to his patients more effectively through the establishment of long-term and personalized relationships with his patients and their families.

218. Vander Bleek believes and follows the Catholic Church's teachings about the sanctity of life, including the Church's teachings regarding direct participation in and formal and material cooperation with assisted suicide.

219. This commitment to the Catholic Church's teachings on the sanctity of life is embodied in Fitzgerald Pharmacy's Mission Statement: "To enhance and preserve human life through the ethical practice of pharmacy from the moment of conception until natural death."[77]

220. Fitzgerald Pharmacy also has a "Choose Life" insignia from the Knights of Columbus prominently displayed in its parking lot.

221. In keeping with his commitment to the Church's teachings on the sanctity of life, Vander Bleek will not stock or dispense "emergency contraceptives," which he

---

[77] Fitzgerald Pharmacy, *Mission Statement*.

believes can act as an abortifacient. *See Morr-Fitz v. Quinn*, 976 N.E.2d 1160 (Ill. App. Ct. 2012).

222. Also in keeping with these beliefs, Vander Bleek will not fill, and will not permit any of Fitzgerald Pharmacy's employees to fill, prescriptions for the purpose of ending any person's life.

223. Fitzgerald Pharmacy stocks the drugs that could be prescribed under EOLOA for purposes of accomplishing a suicide.

224. Fitzgerald Pharmacy serves patients with a terminal disease as defined by EOLOA.

225. Because of his religious convictions, Vander Bleek will not dispense, or allow anyone employed by Fitzgerald Pharmacy to dispense, any of these drugs if they believe the dosage is intended to be lethal. Vander Bleek believes that this would amount to cooperating with the evil of assisted suicide and to causing grave scandal.

226. Because of his religious convictions, Vander Bleek will not refer or allow anyone employed by Fitzgerald Pharmacy to refer a patient seeking to fill a prescription for assisted suicide drugs to another able and willing pharmacy. Vander Bleek believes that this would amount to cooperating with the evil of assisted suicide and to causing grave scandal. Indeed, Vander Bleek believes that referral to an "able and willing" pharmacist amounts to the direct promotion of suicide.

227. On the contrary, because of his religious convictions, Vander Bleek would counsel anyone who came to Fitzgerald Pharmacy to fill a prescription for assisted suicide drugs that their lives have value and dignity up until the very end. He would

then strive to provide his patients with information about other resources that could alleviate the physical and emotional suffering brought about by terminal disease.

***Effects of EOLOA and the HCRCA on Plaintiffs***

228. Under EOLOA and the HCRCA, the Carmelite Sisters and Little Sisters, under threat of civil or criminal penalties, are required:

- to provide terminally ill patients with both information and counseling regarding the availability of assisted suicide;
- to create policies that facilitate the provision of information, counseling, and referrals regarding the provision of assisted suicide to patients;
- to permit healthcare professionals providing care in their homes to provide information and counseling regarding the availability of assisted suicide to terminally ill patients;
- to permit healthcare professionals providing care in their homes to perform a necessary step in qualifying the patient for assisted suicide by documenting a patient's request for suicide;
- to permit healthcare professionals providing care in their homes to refer patients to a willing provider or facility to assist the patient in qualifying for and obtaining assisted suicide drugs;
- to refrain from taking any disciplinary action against a healthcare professional providing care in their homes who gives such information or counseling or who provides such a referral to a terminally ill patient in violation of the institution's religious beliefs and conduct requirements; and

- to refrain from encouraging or counseling patients to continue their lives and seek alternative treatments rather than committing suicide.

229. Under EOLOA and the HCRCA, Vander Bleek and Fitzgerald Pharmacy are required, under threat of civil or criminal penalties:

- to create policies that facilitate the provision of information, counseling, and referrals regarding the provision of assisted suicide to Fitzgerald Pharmacy's patients;
- to permit Fitzgerald Pharmacy's healthcare professionals to refer patients to a willing pharmacy to assist the patients in filling a prescription for assisted suicide drugs;
- to refrain from taking any disciplinary action against a healthcare professional who gives such information or counseling to a terminally ill patient, or who refers that patient to a willing provider, in violation of Vander Bleek and Fitzgerald Pharmacy's religious beliefs; and
- to refrain from encouraging or counseling patients to continue their lives and seek alternative treatments rather than committing suicide.

230. If the Carmelite Sisters, the Little Sisters, Vander Bleek, and Fitzgerald Pharmacy do not conform to the government's pressure to act according to these requirements and prohibitions, they risk professional discipline and the loss of their licenses.

231. Under EOLOA and the HCRCA, Cardinal Cupich would be prohibited from ensuring that Catholic healthcare institutions within the Diocese are acting in accordance with Catholic teaching and the Ethical and Religious Directives.

232. Under EOLOA and the HCRCA, the Carmelite Sisters and Little Sisters would be required to violate the Affordable Care Act, the federal ban on using federal funding to provide assisted suicide, and the Americans with Disabilities Act. This could lead to the loss of any federal funding they receive.

233. EOLOA and the HCRCA are the direct and proximate causes of these irreparable harms.

234. Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Church Autonomy Doctrine

235. All preceding paragraphs are incorporated by reference.

236. The First Amendment's church autonomy doctrine protects the freedom of religious groups "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

237. This includes the freedom to make "personnel decision[s] based on religious doctrine"—including for individuals who would not qualify as ministers. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658-60, 658 n.2 (10th Cir. 2002).

238. It also includes the freedom to make decisions about how to approach moral issues implicating faith and doctrine, such as how to avoid direct participation in and moral cooperation with physician-assisted suicide. *See Kedroff*, 344 U.S. at 116.

239. The Ethical and Religious Directives implicate matters of church governance that must be respected by civil courts.

240. Cardinal Cupich's commitment to enforcing the Ethical and Religious Directives as binding church law within the Diocese is a matter of internal governance that must be respected by civil courts.

241. As a matter of church government, faith, and doctrine, Cardinal Cupich requires that Catholic healthcare institutions under his authority respect the Catholic Church's religious beliefs prohibiting engaging in conduct contrary to the sanctity of human life, including physician-assisted suicide.

242. As a matter of church government, faith, and doctrine, the Carmelite Sisters and the Little Sisters adhere to the Ethical and Religious Directives. Consistent with those Directives, they also require that all employees, staff, volunteers, contractors, and anyone providing care in their homes respect the Catholic Church's religious beliefs prohibiting engaging in conduct contrary to the sanctity of human life, including physician-assisted suicide, as embodied in the Ethical and Religious Directives.

243. Among other things, the Ethical and Religious Directives expressly state: When a patient "requests a medical intervention that is not in accord with Catholic teaching, health care professionals may not refer the patient to another professional

for the purpose of obtaining that intervention."[78] EOLOA's referral mandate that providers either refer to an "able and willing" provider or face potential criminal liability grossly infringes this right to church autonomy. 410 ILCS § 22/70(b)(2).

244. The same analysis applies with respect to EOLOA's and the HCRCA's Counseling, Qualification, Unfaithful Provider, and Death Certificate mandates, all of which violate the Ethical and Religious Directives' commands to avoid any cooperation with assisted suicide and to avoid the sin of scandal.

245. EOLOA and the HCRCA impermissibly intrude on these matters of internal church decision-making and governance by making it impossible for Cardinal Cupich, the Carmelite Sisters and the Little Sisters to operate according to and enforce the Ethical and Religious Directives.

246. EOLOA and the HCRCA violate the Carmelite Sisters' and Little Sisters' rights secured to them by the First Amendment's church autonomy doctrine by exposing them to substantial liability simply for practicing their millennia old religious beliefs.

247. The Carmelite Sisters, the Little Sisters, and Cardinal Cupich will suffer irreparable harm absent declaratory and injunctive relief.

### Count II
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Generally Applicable: Categorical Exemptions

248. All preceding paragraphs are incorporated by reference.

---

[78] *Ethical and Religious Directives* at 16 (Directive 27).

249. "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).

250. Prior to EOLOA and its incorporation of HCRCA, Illinois had a generally applicable, "across-the-board criminal prohibition on a particular form of conduct": assisting another to commit suicide. *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990); *see* 720 ILCS § 5/12-34.5.

251. The religious beliefs of the Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy are in accord with that prohibition; indeed, their religious beliefs categorically forbid them from assisting in any way in another's suicide, including by referring them to someone who they know will assist in that suicide. These same religious beliefs also compel them to encourage anyone indicating a desire for suicide to pursue another path.

252. But through EOLOA, Illinois has carved out a highly detailed, multi-step exemption to the across-the-board rule, rendering EOLOA not generally applicable.

253. Because of EOLOA and its incorporation of HCRCA, Illinois now divides its approach to suicide by placing individuals into two different categories: if a patient is deemed to have a terminal disease under EOLOA, a healthcare entity or professional's *failure to assist* in that patient's suicide opens them up to criminal liability; but if that individual seeks assistance in committing suicide for any other reason, providing that assistance opens those same healthcare entities and professionals up to criminal liability under Illinois' general criminal prohibition against assisting another person to commit suicide.

254. Whether a person's suicide may or may not be assisted thus turns on an "individualized governmental assessment of the reasons for the relevant conduct"—refraining from providing assistance in committing suicide. *Smith*, 494 U.S. at 884; *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

255. Numerous exemptions within EOLOA and its incorporation of HCRCA further underscore that it is not generally applicable. These exemptions include but are not limited to the following:

a. EOLOA covers general hospitals and their affiliates, nursing homes, hospices, ambulatory surgical treatment centers, and home health and nursing providers, while excluding other healthcare facilities where a patient might receive a terminal diagnosis, such as an in-home hospice program or an assisted living facility. 410 ILCS § 22/10. This renders EOLOA not generally applicable.

b. EOLOA applies only to the "physician who has primary responsibility for the care of the patient and treatment of the patient's terminal disease" and to a "physician who is qualified by specialty or experience to make a professional diagnosis and prognosis regarding the patient's disease" who gives a second opinion, *id.*, carving out any other medical provider who may provide significant care to the patient. This renders EOLOA and its incorporation of HCRCA not generally applicable.

c. EOLOA's obligation to refer a patient to an "able and willing" provider … in accordance with the Health Care Right of Conscience Act" applies only to

"healthcare professional[s]," defined as "physician[s], pharmacist[s], or licensed mental health professional[s]." *Id.* § 22/70(b); 22/10. This excludes other healthcare professionals who provide significant care to the patient and who have the power to refer. This renders EOLOA and its incorporation of HCRCA not generally applicable.

d. EOLOA applies only to those it labels as terminal, defined as those with "an incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months." *Id.* This categorially exempts all other seriously ill individuals, as well as those who might seek to end their lives due to non-life-threatening illnesses, rendering EOLOA and its incorporation of the HCRCA not generally applicable.

256. A law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis added).

257. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* The comparability analysis "is concerned with the *risks* various activities pose" to the government's purported interest, not the "*reasons why*" people engage in those activities. *Id.* (emphasis added).

258. By carving out certain patients, providers, and facilities from its scope, Illinois has focused on the "reasons why" a person may pursue suicide, not on the "risks" to its interest in protecting its citizens from the dangers of suicide.

259. Alternatively, the exceptions in EOLOA and its incorporation of HCRCA undermine the State's purported interest in allowing Illinois residents to pursue the "fundamental right to determine their own medical treatment options in accordance with their own values, beliefs, or personal preference," 410 ILCS § 22/5(a)(4).

260. Because EOLOA and its incorporation of HCRCA are not generally applicable, they trigger strict scrutiny, which they cannot pass.[79]

261. Plaintiffs the Carmelite Sisters, the Little Sisters, Cardinal Cupich, Vander Bleek, and Fitzgerald Pharmacy have sincere religious beliefs that require them to provide life-affirming care that respects the dignity of every human life, from conception until natural death. Their sincere religious beliefs prohibit them from cooperating in any gravely immoral act, including physician-assisted suicide. *See, e.g.*, *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 724 (2014); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 693-96 (2020) (Alito, J., concurring) ("Where to draw the line in a chain of causation that leads to objectionable conduct is a difficult moral question, and our cases have made it clear that courts cannot override the sincere religious beliefs of an objecting party on that question").

262. EOLOA and its incorporation of the HCRCA substantially burden those free exercise rights by requiring them to, among other things, inform patients about

---

[79] By contrast, Illinois' general criminal prohibition on assisting a suicide *does* pass strict scrutiny, because the state has a compelling interest in protecting the uniquely valuable life of each of its citizens, and there is no less-restrictive alternative that will protect that interest.

physician-assisted suicide, implement policies that facilitate the provision of information and counseling about assisted suicide, qualify patients for assisted suicide, and refer patients seeking physician-assisted suicide to willing providers. EOLOA and its incorporation of the HCRCA further burden Plaintiffs' religious exercise by prohibiting them from requiring healthcare professionals to abide by their religious beliefs on physician-assisted suicide while providing care at their facilities; and by restricting their ability to form and maintain a healthcare community built on those religious beliefs.

263. Cardinal Cupich serves as the spiritual authority responsible for guiding the faithful, including through Catholic healthcare ministries and individual Catholic healthcare providers. That role necessarily includes issuing binding moral directives on end-of-life care. The MAID Act and PCIA burden these rights by requiring Catholic providers to act contrary to that guidance, meaning he cannot ensure that healthcare is delivered in accordance with religious teaching or that the faithful can receive healthcare in accordance with that teaching.

264. Defendants have no compelling interest in forcing Plaintiffs the Carmelite Sisters, the Little Sisters, Cardinal Cupich, Vander Bleek, and Fitzgerald Pharmacy to participate in physician-assisted suicide.

265. Defendants have not selected the least-restrictive means of furthering any alleged governmental interest.

266. Plaintiffs the Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy and the patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count III**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise Clause**
**Not Neutral: Religious Gerrymander**

267. All preceding paragraphs are incorporated by reference.

268. Under the Free Exercise Clause, it is "never permissible" to target religious beliefs and religious status for disfavored treatment. *Lukumi*, 508 U.S. at 533.

269. Imposing "special disabilities on the basis of religious views" triggers strict scrutiny. *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 460-61 (2017).

270. "A law that targets religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson v. Makin*, 596 U.S. 767, 780-81 (2022).

271. Because the Free Exercise Clause even "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," *Lukumi*, 508 U.S. at 534, a law is not neutral where its effects "fall[] disproportionately on religious observers" such that "the law's checkered application can only be explained as a 'religious gerrymander.'" *Mahwikizi v. Ctrs. for Disease Control & Prevention*, 573 F. Supp. 3d 1245 (N.D. Ill. 2021) (quoting *Lukumi*, 508 U.S. at 534).

272. A "religious gerrymander" occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 535-536.

273. EOLOA and the HCRCA lack any exemption for its counseling mandate, despite the well-known fact that Catholic healthcare providers and facilities object to participating in physician-assisted suicide in any way.

274. EOLOA and the HCRCA force providers to participate in the initial step of qualifying a patient for assisted suicide, despite the well-known fact that Catholic healthcare providers and facilities object to participating in physician-assisted suicide in any way.

275. EOLOA and the HCRCA force religious providers to refer patients to "able and willing" providers to escape the remainder of qualifying patients for assisted suicide, and prescribing assisted suicide drugs, despite the well-known fact that Catholic healthcare providers and facilities object to participating in physician-assisted suicide in any way.

276. On information and belief, most providers and institutions who object to providing information about, referring patients, or qualifying patients for physician-assisted suicide do so based on religious objections.

277. EOLOA and the HCRCA thus create a religious gerrymander by targeting a subset of religiously motivated actors.

278. EOLOA and the HCRCA therefore "violate[] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

279. Defendants cannot satisfy strict scrutiny because they lack a compelling interest and the law is not narrowly tailored.

280. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, Fitzgerald Pharmacy and the patients they serve, will suffer irreparable harm absent declarative and injunctive relief.

**Count IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Compelled Speech**

281. All preceding paragraphs are incorporated by reference.

282. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Accordingly, the Constitution does not "allow[] a government to coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own." *303 Creative v. Elenis*, 600 U.S. 570, 598 (2023).

283. These "First Amendment[] protections extend to licensed professionals much as they do to everyone else." *Chiles v. Salazar*, 146 S. Ct. 1010, 1022 (2026); *see NIFLA v. Becerra*, 585 U.S. 755, 766-67 (2018).

284. When the government "compel[s] clinics [and providers] to speak the State's message, the law regulate[s] speech based on its content." *Chiles*, 146 S. Ct. at 1022 (citing *NIFLA*, 585 U.S. at 766).

285. Such content-based laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve

compelling state interests." *NIFLA*, 585 U.S. at 766; *see Brown v. Ent. Merchs.*, 564 U.S. 786, 799 (2011).

286. When the government "seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject," the law also discriminates based on viewpoint, making "the violation of the First Amendment … all the more blatant." *Chiles*, 146 S. Ct. at 1021.

287. EOLOA and the HCRCA compel speech in ways that discriminate based on both content and viewpoint.

288. EOLOA and the HCRCA force the Carmelite Sisters and the Little Sisters to advise and counsel patients about the availability and "benefits" of assisted suicide as a legitimate treatment option for certain patients.

289. EOLOA and the HCRCA therefore prohibit the Carmelite Sisters and the Little Sisters from advising and counseling patients about their treatment options without including the government's preferred message that assisted suicide as a treatment option for certain patients.

290. Going still further, EOLOA and its incorporation of the HCRCA expose the Carmelite Sisters, the Little Sisters, Vander Bleek, and Fitzgerald Pharmacy to criminal liability for exerting "undue influence" or "coercion" of their patients if they follow their religious beliefs and seek to dissuade their patients from choosing assisted suicide.

291. And EOLOA forces the Carmelite Sisters and the Little Sisters to permit the documentation of a patient's request for suicide, which EOLOA defines as the first step in qualifying a patient for a procedure they find gravely immoral and detrimental to the patient's well-being.

292. EOLOA and the HCRCA are content-based because they, among other things, compel speech that "draws distinctions based on the message a speaker conveys" about assisted suicide. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). EOLOA and the HCRCA are therefore "presumptively unconstitutional." *NIFLA*, 585 U.S. at 766.

293. EOLOA and the HCRCA discriminate based on viewpoint because, among other things, the "specific motivating ideology" promoted by the state is that assisted suicide is a legitimate treatment option. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

294. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy are unable to speak *their* preferred message that, consistent with their sincere religious beliefs, assisted suicide is not a legitimate treatment option for any disease without threat of criminal penalty.

295. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy also have a First Amendment interest in expressing and maintaining a consistent moral message; requiring them to facilitate or endorse contrary communications infringes their right against compelled speech.

296. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy also have an affirmative right to speak in accordance with their mission. By requiring them to allow employees to speak contrary to that message, EOLOA and the HCRCA infringe on the facility's free speech rights.

297. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy are threatened with professional discipline, fines, and criminal liability if they stand on their rights and speak their preferred message rather than the government's.

298. Defendants have no compelling interest in forcing religious objectors to state their preferred message, nor is the law narrowly tailored.

299. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy will suffer irreparable harm absent declaratory and injunctive relief.

**Count V**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Expressive Association**

300. All preceding paragraphs are incorporated by reference.

301. The Supreme Court has "long understood" that "[t]he First Amendment guarantees all Americans" a "right to associate with others." *First Choice Women's Res. Ctrs. v. Davenport*, 146 S. Ct. 1114, 1122 (2026).

302. This freedom of association protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *See id.*; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *Christian Legal Soc'y v. Walker*,

453 F.3d 853, 858, 862-63 (7th Cir. 2006); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023).

303. "[A]ssociational rights carry special significance for political, social, religious, and other minorities," and "government actions tending to curtail the freedom to associate warrant the closest scrutiny." *First Choice*, 146 S. Ct. at 1122 (cleaned up).

304. The Carmelite Sisters and the Little Sisters are expressive associations joined together for the purpose of providing Catholic healthcare in a manner consistent with the Catholic Church's teachings on the sanctity of life, including end-of-life care.

305. As the head of the Archdiocese of Chicago, Cardinal Cupich maintains an expressive association with Catholic healthcare facilities within the Archdiocese for the purpose of providing Catholic healthcare in a manner consistent with the Catholic Church's teachings on the sanctity of life, including end-of-life care.

306. In order to maintain this expression consistently, the Carmelite Sisters, the Little Sisters, and Cardinal Cupich must be able to associate with only those providers who agree to respect their religious conduct standards, including regarding physician-assisted suicide. This expression of belief includes the Carmelite Sisters', the Little Sisters', and Cardinal Cupich's view that assisted suicide is not a legitimate treatment option and that it is morally wrong to inform patients about the "benefits" of suicide, counsel patients about the benefits of suicide, qualify patients for assisted

suicide, prescribe lethal drugs to accomplish assisted suicide, or refer patients to providers or facilities willing to engage in any of the above.

307. The Carmelite Sisters', the Little Sisters', and Cardinal Cupich's religious beliefs about treating patients with dignity and the sanctity of life are central to their religious mission.

308. EOLOA prohibits the Carmelite Sisters, the Little Sisters, and Cardinal Cupich from taking adverse action against healthcare professionals whose words or conduct would undermine their religious expression, such as by advocating for actions inconsistent with their religious beliefs and messages. *See* 410 ILCS § 22/65(e). This will force them into expressive associations that directly undermine and contradict their religious expression and the Catholic way of providing care that is central to their religious mission.

309. Altogether, the sprawling requirements of EOLOA and the HCRCA could force the Carmelite Sisters, the Little Sisters, and Cardinal Cupich to work with healthcare providers—the face of the organization to its patients and the beating heart of healthcare—who take actions diametrically opposed to the Catholic way of caring for the sick until natural death.

310. Defendants have no compelling interest justifying the infringement on the freedom of association of Cardinal Cupich, as well as the Carmelite Sisters, the Little Sisters, and the patients they serve.

311. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

312. The Carmelite Sisters, the Little Sisters, and Cardinal Cupich will be harmed absent injunctive and declaratory relief.

**Count VI**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise of Religion**

313. All preceding paragraphs are incorporated by reference.

314. The Free Exercise Clause protects "first and foremost, the right to believe and profess, but also the right to engage in religiously motivated conduct." *Korte v. Sebelius*, 735 F.3d 654, 676 (7th Cir. 2013) (cleaned up). Thus, the government can neither prohibit religious exercise outright, nor pressure an individual to forego his religious exercise.

315. Where a government makes it impossible for an individual to participate in his religious observances, it has substantially burdened that religious exercise. *See id.* at 682-83. This is especially salient where a policy would leave an individual "unable to engage in protected religious exercise in the final moments of his life." *Ramirez v. Collier*, 595 U.S. 411, 433 (2022).

316. So too, "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or … denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists;" and, even if "the compulsion" is "indirect," "the infringement upon free exercise is nonetheless substantial." *Thomas v. Rev. Bd.*, 450 U.S. 707, 717-18 (1981).

317. Consistent with their sincere religious beliefs, many of the current and prospective patients served by Plaintiffs the Carmelite Sisters and the Little Sisters

believe that artificially hastening natural death is gravely sinful. Also consistent with their sincere religious beliefs, they do not wish to discuss, nor entertain discussion of, the so-called "benefits" of committing suicide.

318. EOLOA and the HCRCA substantially burden these patients' rights to approach death consistent with their Catholic faith. Their attending physician would be required to discuss assisted suicide as a legitimate treatment option, during a time when they may already be experiencing deep distress over their terminal diagnosis and may have no interest in hearing their trusted physician suggest that they consider a course of action that their faith forbids.

319. Moreover, EOLOA and the HCRCA put these patients to a perverse choice: either seek end-of-life care from a physician or nurse practitioner who will discuss the option of suicide and its "benefits" with them as a legitimate medical treatment or forego end-of-life care altogether.

320. As set forth above, EOLOA and the HCRCA are neither neutral nor generally applicable.

321. Defendants have no compelling interest justifying the infringement on these patients' free exercise of religion.

322. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

323. The Carmelite Sisters and the Little Sisters maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See Shimer v. Washington*, 100

F.3d 506, 508 (7th Cir. 1996) (third party standing satisfied where there is a "hindrance to the third party's ability to protect his own interest").

324. Defendants have no compelling interest in forcing religious objectors to state their preferred message, nor is the law narrowly tailored.

325. The current and prospective patients served by the Carmelite Sisters, and the Little Sisters will suffer irreparable harm absent declaratory and injunctive relief.

**Count VII**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Freedom of Religious Association and Right of Assembly**

326. All preceding paragraphs are incorporated by reference.

327. The Supreme Court has "long understood" that "[t]he First Amendment guarantees all Americans" a "right to associate with others." *First Choice*, 146 S. Ct. at 1122.

328. This freedom of association protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *See id.*; *Dale*, 530 U.S. at 647-48; *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 862-63 (7th Cir. 2006); *Slattery*, 61 F.4th at 278.

329. "[A]ssociational rights carry special significance for political, social, religious, and other minorities," and "government actions tending to curtail the freedom to associate warrant the closest scrutiny." *First Choice*, 146 S. Ct. at 1122 (cleaned up).

330. The right of assembly protected by the First Amendment also guarantees these patients the right to gather with those who share their common religious beliefs. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200-01 (2012) (Alito, J., joined by Kagan, J., concurring).

331. Some of the current and prospective patients served by the Carmelite Sisters and Little Sisters wish to receive and associate with healthcare communities who agree to respect their religious conduct standards regarding matters concerning the sanctity of human life, including physician-assisted suicide. This expression of belief includes the view that assisted suicide is not a legitimate treatment option and is inconsistent with human dignity and the sanctity of life.

332. If these patients are forced to seek end-of-life care from providers whose words or conduct would undermine their religious expression, such as by advocating for actions inconsistent with their shared religious beliefs and messages, they would be forced into expressive associations that directly undermine and contradict their religious expression.

333. These patients wish to exercise their associational rights by living out their final days in the company of those who will not infringe upon their dignity by implying, explicitly or implicitly, that assisted suicide is a legitimate treatment option that has "benefits." By forcing patients to associate with those speaking a message that suicide is a legitimate option, Defendants have burdened that right.

334. Defendants have no compelling interest justifying the infringement on these patients' freedom of association.

335. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

336. The Carmelite Sisters and the Little Sisters maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See Shimer*, 100 F.3d at 508 (third party standing satisfied where there is a "hindrance to the third party's ability to protect his own interest").

337. The Carmelite Sisters, the Little Sisters, and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count VIII**
**42 U.S.C. § 1983**
**Violation of the Americans with Disabilities Act**

338. All preceding paragraphs are incorporated by reference.

339. Title II of the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination." 42 U.S.C. § 12132.

340. A "public entity" includes State and local governments, their agencies, and their instrumentalities. *Id.* § 12131(1).

341. Defendants are public entities and/or officers of public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

342. The ADA defines a qualified individual with a disability as a person who has "a physical or mental impairment that substantially limits one or more major life

activities," 42 U.S.C. § 12102(1)(A), including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," *id.* § 12102(2)(A).

343. "[M]ajor life activit[ies]" also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

344. Discrimination occurs when, among other things, disabled people are offered services that are "not equal to" those provided to others, 28 C.F.R. § 35.130(b)(1)(ii), or are less effective, *id.* § 35.130(b)(1)(iii).

345. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy serve patients who are qualified individuals with disabilities.

346. Many of the Carmelite Sisters', Little Sisters', Vander Bleek's, and Fitzgerald Pharmacy's patients who receive terminal diagnoses as defined by EOLOA are qualified individuals with disabilities under the ADA.

347. Defendants' policy of forcing the Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy to inform terminally ill patients with disabilities about the option of assisted suicide, while protecting them from offering suicide to nondisabled patients, amounts to discrimination against their patients under Title II of the ADA.

348. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See Shimer*, 100 F.3d at 508 (third party standing satisfied where there is a "hindrance to the third party's ability to protect his own interest").

349. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count IX**
**Violation of U.S. Const. Art. VI, cl. 2.**

350. All preceding paragraphs are incorporated by reference.

351. The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

352. The Supreme Court has "held that state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner v. Myrick*, 514 U.S. 280, 287 (1995)).

353. Federal law prohibits the Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy from using federal healthcare funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." 42 U.S.C. § 14402(a)(1).

354. EOLOA and the HCRCA compel the Carmelite Sisters, the Little Sisters, Luke Vander Bleek, and Fitzgerald Pharmacy to violate that ban by directly funding services that facilitate assisted suicide, including but not limited to information, counseling, qualification, and prescribing.

355. It is not possible to comply with both laws by separating all information and counseling related to suicide and qualification for assisted suicide from the treatment provided by the Carmelite Sisters and the Little Sisters, since EOLOA and the HCRCA mandate that such information, counseling, qualification, prescription, and administration be overseen by attending physicians as part and parcel of the patient's general treatment.

356. It is impossible for the Carmelite Sisters, the Little Sisters, Vander Bleek, and Fitzgerald Pharmacy to "comply with both its state-law duty to" provide these services "and its federal-law duty not to" do so. *Mut. Pharm. v. Bartlett*, 570 U.S. 472, 480 (2013).

357. "Accordingly, the state law is pre-empted." *Id.*

358. The Carmelite Sisters, the Little Sisters, Luke Vander Bleek, Fitzgerald Pharmacy, and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count X**
**42 U.S.C. § 18113**
**Violation of the Affordable Care Act; Prohibition against Discrimination on Assisted Suicide**
**Suit in Equity**

359. All preceding paragraphs are incorporated by reference.

360. The Affordable Care Act says that "any State … that receives Federal financial assistance … may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a).

361. On information and belief, the State of Illinois receives Federal financial assistance within the meaning of the Affordable Care Act.

362. The Carmelite Sisters, the Little Sisters, Vander Bleek, the "institutional health care entit[ies]" that they operate, and their "individual … health care entity" employees are within the zone of interests protected by 42 U.S.C. § 18113(a).

363. As described above and incorporated here by reference, through EOLOA and the HCRCA, Illinois discriminates against the Carmelite Sisters, the Little Sisters, Vander Bleek, the "institutional health care entit[ies]" that they operate, and their "individual … health care entity" employees "on the basis that [they] do[] not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual." *Id.*

364. The Carmelite Sisters, the Little Sisters, Vander Bleek, Fitzgerald Pharmacy, their employees, and the current and prospective patients they serve will suffer irreparable harm absent injunctive relief.

**Count XI**
**42 U.S.C. § 1983**
**U.S. Const. Amend. XIV: Equal Protection**

365. All preceding paragraphs are incorporated by reference.

366. The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

367. EOLOA and the HCRCA are unconstitutional because they treat people who are disabled by reason of a terminal illness on unequal terms with similarly situated people without a rational basis or compelling interest.

368. EOLOA and the HCRCA discriminate against people who are disabled by reason of a terminal disease, denying protections and safeguards, without any rational basis. This undermines and interferes with Illinois' interest in suicide prevention by sanctioning the act of helping someone else kill themselves based on arbitrary designations applied inconsistently.

369. Diagnoses of terminal illnesses are inherently uncertain. Some people with terminal diagnoses can make full recoveries. Others can live for many years with adequate care and treatment, such as that provided in Plaintiffs' facilities. All of these factors demonstrate the uncertainty of a terminal diagnosis and the lack of even a rational basis for this distinction in law.

370. Because EOLOA and the HCRCA implicate a fundamental right—the right to live—the discrimination warrants a heightened level of review.

371. The Carmelite Sisters, the Little Sisters, and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

## Count XII
## 42 U.S.C. § 1983
## U.S. Const. Amend. XIV: Equal Protection

372. All preceding paragraphs are incorporated by reference.

373. Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

374. The Equal Protection Clause prohibits discrimination on the basis of religion.

375. Defendants have deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through statutes that treat Plaintiffs differently than similarly situated individuals and institutions because of Plaintiffs' religious beliefs regarding the sanctity of life and their religious obligations to avoid cooperation in assisted suicide.

376. EOLOA and the HCRCA discriminate between religious individuals and institutions who, like Plaintiffs, have religious objections to helping a patient identify and locate providers or institutions that will evaluate and qualify a patient for, and prescribe that patient, assisted suicide drugs, and those who do not.

377. EOLOA and the HCRCA thus "differentiate[] between religions along theological lines." *Catholic Charities Bureau v. Wisc. Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025).

378. Defendants have no compelling interest justifying the infringement on Plaintiffs' Fourteenth Amendment rights.

379. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

380. The Carmelite Sisters, the Little Sisters, Vander Bleek, Fitzgerald Pharmacy, their employees, and the current and prospective patients they serve will suffer irreparable harm absent injunctive relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Issue a temporary restraining order and a preliminary and permanent injunction preventing Defendants and all those acting in concert with them from requiring Plaintiffs and all those acting in concert with them or providing care on their premises to counsel patients about assisted suicide; provide information about assisted suicide; assist a patient to qualify for assisted suicide in any way; fill a prescription for suicide drugs; or to refer a patient to a provider willing to complete any of these steps; or falsely fill out a death certificate for a patient who dies by assisted suicide;

b. Issue a temporary restraining order and a preliminary and permanent injunction preventing Defendants from taking any adverse action against Plaintiffs and all those acting in concert with them or providing care on their premises for encouraging residents and patients to pursue avenues other than assisted suicide based on their religious beliefs;

c. Issue a temporary restraining order and a preliminary and permanent injunction preventing Defendants from taking any adverse action against Plaintiffs and all those acting in concert with them or providing care on their premises for

requiring "health care professional[s]" to abide by Plaintiffs' religious beliefs when providing care in their facilities or on their premises;

d. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate the First Amendment's church autonomy doctrine, Free Speech Clause, and Free Exercise Clause;

e. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate Title II of the Americans with Disabilities Act;

f. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, are preempted by the Assisted Suicide Funding Restriction Act of 1997;

g. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate the Affordable Care Act;

h. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate the Equal Protection Clause of the Fourteenth Amendment;

i. Award Plaintiffs nominal, compensatory, actual, and punitive damages for the loss of their rights under federal law;

j. Award attorneys' fees and costs under 42 U.S.C § 1988; and

k. Award any such other relief as the Court may deem just and proper.

Respectfully submitted this 3rd day of September, 2026.

/s/ Jordan T. Varberg
Jordan T. Varberg
Mark L. Rienzi*
Laura Wolk Slavis*

Adèle A. Keim*
Benjamin A. Fleshman*
Siena A. Marcelle*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, DC 20006
(202) 955-0095
jvarberg@becketfund.org

*Admission application forthcoming

*Attorneys for Plaintiffs*

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Mother Mary Rose Heery, O.Carm., declare under penalty of perjury as follows:

1. I am the Prioress General of the Carmelite Sisters for the Aged and Infirm. I am authorized to make this verification on behalf of the Carmelite Sisters for the Aged and Infirm, Inc. and St. Patrick's Residence.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning the Carmelite Sisters for the Aged and Infirm, Inc. and St. Patrick's Residence are true and correct to the best of my knowledge, information, and belief.

Dated: August 28, 2026

Mother Mary Rose Heery, O.Carm.
Prioress General
Carmelite Sisters for the Aged and Infirm, Inc.

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Mother Julie Horseman, L.S.P., declare under penalty of perjury as follows:

1. I am the Mother Provincial for the Chicago Province of the Little Sisters of the Poor. I am authorized to make this declaration on behalf of Little Sisters of the Poor Chicago Province, Inc., Little Sisters of the Poor Chicago, Inc. d/b/a St. Mary's Home, and Little Sisters of the Poor of Palatine, Inc. d/b/a St. Joseph's Home.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning Little Sisters of the Poor Chicago Province, Inc., Little Sisters of the Poor Chicago, Inc. d/b/a St. Mary's Home, and Little Sisters of the Poor of Palatine, Inc. d/b/a St. Joseph's Home are true and correct to the best of my knowledge, information, and belief.

Dated: Sep. 2, 2026

Mother Julie Horseman, lsp

Mother Julie Horseman, L.S.P.
Mother Provincial
Chicago Province of the Little Sisters
of the Poor

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, James C. Geoly, declare under penalty of perjury as follows:

1. I am the General Counsel for the Archdiocese of Chicago. I am authorized to make this declaration on behalf of His Eminence Blase Cardinal Cupich.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning the doctrine of the Catholic Church, the Ethical and Religious Directives, His Eminence Blase Cardinal Cupich, and the Archdiocese of Chicago are true and correct to the best of my knowledge, information, and belief.

Dated: September 2, 2026

James C. Geoly
General Counsel
Archdiocese of Chicago

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Luke Vander Bleek, declare under penalty of perjury as follows:

1. I am the President and sole shareholder of Morr-Fitz, Inc., which operates Fitzgerald Pharmacy, a community pharmacy located in Morrison, Illinois. I am authorized to make this verification on behalf of myself and Morr-Fitz Inc., d/b/a Fitzgerald Pharmacy.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning myself and Morr-Fitz, Inc., d/b/a Fitzgerald Pharmacy are true and correct to the best of my knowledge, information, and belief.

Dated: 8-31-2026



Luke Vander Bleek
President
Morr-Fitz, Inc.